950 P.2d 1141

Governor Jane Dee HULL,
Intervenor/Petitioner,

v.

Hon. Rebecca A. ALBRECHT, Judge of
the Superior Court of the State of
Arizona, Respondent Judge,

and

ROOSEVELT ELEMENTARY SCHOOL
DISTRICT NO. 66, et al; Lisa Graham
Keegan, Superintendent of Public In-
struction; State Board of Education;
State of Arizona, Real Parties in Inter-
est.

No. CV–97–0369–SA.

Supreme Court of Arizona,
En Banc.

Dec. 23, 1997.

Reconsideration Denied Feb. 18, 1998.*

* McGregor, J., did not participate in the determi-    nation of this matter.

Jones, Skelton & Hochuli by William R. Jones, Jr., Eileen J. Dennis, Monica D. Beerling, Phoenix, for Governor Jane Dee Hull.

Arizona Center for Law in the Public Interest by Timothy M. Hogan, Phoenix, David S. Baron, Tucson, for Roosevelt Elementary School District No. 66.

Grant Woods, Attorney General by Sydney K. Davis, Assistant Attorney General, Phoenix, for Lisa Graham Keegan, Superintendent of Public Instruction, State Board of Education, State of Arizona.

Thomas W. Pickrell, Phoenix, for Amicus Curiae Arizona School Boards Association, Inc.

Horne, Kaplan & Bistrow, P.C. by Thomas C. Horne, Phoenix, for Amicus Curiae Paradise Valley School District No. 69.

Jennings, Strouss & Salmon, P.L.C. by Philip J. MacDonnell, Gregory J. Stanton, Phoenix, for Amici Curiae Cave Creek Unified School District, Deer Valley Unified School District, Gilbert Public Schools, Madison Elementary School District No. 38, Mesa Unified School District No. 4, Osborn Elementary School District No. 8, Phoenix Elementary School District No. 1, Scottsdale Unified School District No. 48, Wilson Elementary School District No. 7.

Gust Rosenfeld, P.L.C by Richard A. Segal, Fred H. Rosenfeld, Phoenix, for Amicus Curiae Gust Rosenfeld, P.L.C.

Marc Spitzer, Senate Majority Leader, Donald W. Jansen, Attorney to the Majority of the House of Representatives, Richard A. Bark, Attorney to the Majority of the Senate, Phoenix, for Amici Curiae Arizona State Legislators.

## OPINION

MARTONE, Justice.

This is a petition for special action brought by the Governor of Arizona against the Roosevelt Elementary School District, other districts, the Superintendent of Public Instruction, and the State Board of Education, seeking judicial review of the superior court's order denying the Governor's motion for a declaration that recent amendments to Arizona's school finance legislation complied with this court's mandate in *Roosevelt Elementary School District v. Bishop,* 179 Ariz. 233, 877 P.2d 806 (1994). After hearing, we accepted jurisdiction and denied relief. In light of the urgency of the matter, and in order to eliminate any delay occasioned by the preparation of an opinion, we entered an order on October 24, 1997, approving the order of the trial court with opinion to follow.

### I. History

In *Roosevelt Elementary School District v. Bishop,* we held that the state's education financing system, taken as a whole, did not comply with Article XI, Section 1 of the Arizona Constitution[1] because it directly caused substantial capital facility disparities. The system was "a combination of heavy reliance on local property taxation, arbitrary school district boundaries, and only partial attempts at equalization." 179 Ariz. at 242, 877 P.2d at 815. We said that "the state's financing scheme could do nothing but produce disparities." *Id.* We remanded to the trial court to retain jurisdiction to enforce our mandate.

In 1996, the legislature amended the financing system, but preserved intact the overall scheme. The trial court and this court concluded that the amendments were insufficient to comply with our mandate. Order filed Jan. 15, 1997.

---

1. Article XI, § 1, Ariz. Const., provides that "[t]he legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system...."

In 1997, the legislature amended the system again with the Assistance to Build Classrooms Fund (ABC legislation), 1997 Ariz. Sess. Laws Ch. 4. In April 1997, the Governor filed a motion in the superior court seeking a declaration that the latest amendments complied with this court's mandate. After an evidentiary hearing, the trial court concluded that the amendments were insufficient. Minute Entry of Aug. 20, 1997.[2] The Governor then filed this petition.

## II. The ABC Legislation

### A. The Assistance to Build Classrooms Fund

The ABC legislation attempts to remedy disparities by providing a steady, need-based stream of income to low wealth school districts. *See* 1997 Ariz. Legis. Serv. 397–428 (West) (codified as amended in scattered sections of Titles 15, 37, and 42). The ABC Fund would contain $32.5 million in the first year of operation. The formula used to distribute ABC funds first requires that a district's student count be weighted in order to account for growth. This number is then multiplied by $350 per common school pupil[3] in the district and $525 per high school pupil in the district, which yields the district's gross ABC allotment. This gross allotment is then reduced by using one of two deductions. The assessed value deduction reduces the ABC allotment based upon property values within a district—the higher a district's property values, the greater the deduction from the district's gross ABC allotment. Alternatively, the equalization assistance percentage deduction reduces a district's ABC allotment in proportion to the portion of the district's maintenance and operation budget that comes from state equalization assistance. Both deduction formulas are designed to determine a district's need for capital aid. Once both deductions are calculated, the larger of the two is subtracted from the district's gross ABC allotment to yield the

district's net ABC grant. A.R.S. § 15–1061 (Supp.1997).

Districts must use their allocation for capital expenditures. They may spend their allocation directly, they may save it, or they may choose, subject to district-voter approval, to use the allocation to issue revenue bonds. The issuance of revenue bonds allows the districts to leverage their ABC allocation. The districts may borrow a larger amount from investors in the current budget year, to be repaid from their future ABC income stream. However, districts receiving ABC funds would still need to issue general obligation bonds in order to fund major capital projects—bonds that are backed by property values within a district. The ABC plan also places caps on the amount per student that the state's higher wealth districts may raise through the issuance of general obligation bonds. A.R.S. § 15–1021(C)(Supp.1997). The plan thus attempts to "raise the bottom" by providing low wealth districts with access to bond revenues and "lower the top" by placing limits on the amount per pupil that districts with high property wealth may raise for capital projects.

The Governor concedes that the ABC legislation results in disparities in revenue-raising abilities among districts. The Governor and other proponents of the legislation assert that the disparity, at worst, is 4:1. The Governor arrives at this ratio by assuming that, under current financial conditions, the districts can leverage their yearly ABC allotment, through revenue bonding, by a factor of nine.[4] Thus, a hypothetical high school district receiving 100% of its possible ABC grant of $525 per growth-weighted student could use that yearly income stream to issue revenue bonds in the amount of $4,777 per high school student. When this number is multiplied by four, one arrives at the general obligation bonding cap per high school stu-

---

2. This was a post-judgment enforcement proceeding, and thus the burden was on the state to show compliance.

3. A common school pupil is a pupil enrolled in programs for preschool children with disabilities, kindergarten programs, and grades one through eight. A.R.S. § 15–1061(H)(1)(Supp.1997).

4. The actual factor used by the Governor is 9.1, which is derived from the net present value of the annual ABC revenue stream under a 15 year, 7 percent repayment obligation. For the purpose of clarity, we round the number to 9.

dent imposed on wealthier districts not eligible for any ABC funds: $19,100. Thus, in the hypothetical scenario, two school districts in Arizona with identical student counts would have differences in revenue-raising ability of 400%. The proponents of the ABC legislation claim that this disparity is not substantial. They assert that the average disparity state-wide would be 2.21:1 for high schools and 3.35:1 for elementary schools.

The Roosevelt District disputes these ratios. It claims that the net present value of the ABC revenue stream is arrived at by multiplying the ABC allocation by a factor of roughly three, not a factor of nine.[5] If this were the case, then the disparity between districts' bonding ability would widen. Again, comparing a hypothetical district receiving 100% ABC funding to a district using its full general obligation bonding ability, a ratio on the order of 12:1 or higher would result. Nevertheless, the resolution of this debate is not crucial to our analysis. We assume that the ABC legislation is capable of creating a disparity in revenue-raising ability of 4:1.

### B. The School Capital Equity Fund

The ABC legislation also makes changes to the program by which the State Board for School Capital Facilities disburses funds from the School Capital Equity Fund. *See* A.R.S § 15–1054 (Supp.1997). In 1996, the trial court held that this program, in its original form, did not cure disparities in the school finance system, and we agreed. Order filed Jan. 15, 1997. The new version before us contains changes that work, in part, to limit grant eligibility to the state's poorest districts. However, we find that these changes do not materially alter the program we previously found unacceptable. We thus focus on the ABC Fund.

### III. Analysis

### A. The ABC Legislation Institutionalizes Substantial Disparities

█ As we discussed at great length in *Roosevelt,* 179 Ariz. at 233, 877 P.2d at 806, the problem with the existing capital funding mechanism is its heavy reliance upon property taxes at the school district level, where the value of property within each district varies enormously. Because the presence of taxable property within each district bears no relationship to the capital needs of each district, it is difficult to create a general and uniform system with such heavy reliance upon district based property taxation. Such a system will inevitably lead to disparities unless full or substantial equalization occurs. The ABC legislation does not purport to do that. It creates a very small fund, the amount of which bears no relationship to the capital needs of any district. The fund itself is a mere supplement to the existing general obligation bonding scheme which caused the problem in the first instance. The ABC Fund does not purport to equalize inherently unequal districts. At optimum, it settles for a four to one ratio, hardly substantial equalization.[6] And to achieve this, it imposes caps on the ability of districts to issue general obligation bonds. But, as we said in *Roosevelt,* the ability to go above and beyond the state system is the key to local control.

---

**5.** There are reasons to question the soundness of multiplying the district's ABC allotment by nine in order to determine a district's revenue bonding capacity. During a deposition, the Governor's government finance expert testified that the nine multiplier assumes that bond investors will require no coverage ratios and no reserve requirements. He testified that a more typical coverage ratio of 3:1 or higher was possible, meaning that the revenues backing the debt service on a bond must be three times the debt service. If the investors in the excise tax revenue bonds created by ABC required this typical coverage ratio, then the districts would be able to leverage their ABC allotment not by a factor of 9:1, but by a factor of 3:1. Additionally, investors would typically require a reserve require-ment, which is a set aside of a portion of the debt service on the bond. The expert stated that one year's worth of debt service is a typical reserve requirement. This would further decrease the districts' ability to leverage their ABC allotment. The expert surmised, nevertheless, that a 9:1 ratio was possible, because "everything in life is negotiable." (Dep. of Mr. Patrick Flynn, June 12, 1997, at 17–22).

**6.** And thus the ABC legislation is structurally incapable of curing the problem. That is why the "wait and see" approach advanced by the dissent, while good advice in other contexts, will not work here.

The ABC legislation deals inadequately with the symptoms and does not address the core problem—heavy reliance on district property taxation with unequalized districts. The net effect is that the state imposes vastly different tax burdens on citizens in different districts to support a state obligation. *See, e.g., Claremont Sch. Dist. v. Governor*, 97-001, 1997 WL 774819 at *4-5, 703 A.2d 1353, 1354-55 (N.H.1997). It is possible that the legislature could cure this problem and still rely upon district based property taxation, but it would require substantial equalization at some adequate level of capital facilities.

B. The ABC Legislation Improperly Delegates Responsibility for a General and Uniform System to Individual Districts

■ Local control does not include the freedom of a district to go below the state system by choosing not to finance adequate capital facilities. As we said in *Roosevelt*, the duty under Article XI, Section 1, is a state responsibility. The state cannot choose, as does the ABC legislation, a system that allows voters within the school districts to opt out by choosing not to issue bonds.

C. The ABC Legislation Fails to Set a Standard Against Which Equalization May Be Judged

■ The concepts of statewide substantial equalization and local option to go above and beyond the standard are irreconcilable unless the legislature establishes standards for adequate capital facilities. Once a standard is set, the legislature must choose a funding mechanism that does not cause substantial disparities and that ensures that no school in Arizona falls below the standard. A district may then choose to go above, but not below, the statewide standards for capital facilities, and this will not run afoul of the general and uniform requirement. The general and uniform requirement applies only to the state's constitutional obligation to fund a public school system that is adequate. De- fining adequacy, in the first instance, is a legislative task. But, in addition to providing a minimum quality and quantity standard for buildings, a constitutionally adequate system will make available to all districts financing sufficient to provide facilities and equipment necessary and appropriate to enable students to master the educational goals set by the legislature or by the State Board of Education pursuant to the power delegated by the legislature. *See, e.g.*, A.R.S. § 15-203(A)(12)(Supp.1997).

■ The ABC legislation ignores the uniformity requirement because the dollar amount chosen to cure inadequacies in public school facilities is arbitrary and bears no relation to actual need. The baseline chosen must establish the level of funds necessary to (1) bring existing facilities up to an adequate standard; (2) construct new and adequate facilities for growing districts; and (3) maintain all capital facilities at the adequacy level.

D. Approaches

If the legislature chooses to continue to rely on district based property taxation, substantial equalization to meet statewide standards is required by the uniformity clause. Districts that choose to go beyond these standards may do so by further taxation. Caps, such as those contained in the ABC legislation, are unnecessary.

Instead, it is more likely that this problem could be solved by abandoning heavy reliance upon district based property taxation with unequalized districts. For example, the legislature could decide to fund adequate facilities statewide through some other form or combination of taxation, such as the sales tax, or the income tax. Each district could go above and beyond by taxing its own property. Artificial caps on the power of a district to tax its property only promote a form of equalization not required by the constitution. Caps are antithetical to local control and only artificially promote equalization.

In the alternative, the state could fund capital facilities through a statewide property tax. If a statewide property tax generated capital facilities that met the constitutional standard of general and uniform (as defined by a constitutionally adequate reference point), then districts could be empowered to

go above and beyond that without running afoul of the constitution.

Or the school districts in Arizona could be consolidated in a way in which each district had roughly comparable values. *See, e.g.,* A.R.S. §§ 15–441(A), 15–443, 15–460 (1991).

Which approach to take, of course, is up to the legislature. Any approach will have to assure that capital facility disparities are not driven by the mechanism chosen. Any plan that caps the districts in order to force equalization based upon an inherently unequal tax base is likely to destroy the ability of districts to go above and beyond and thereby jeopardize the future of public schools. For example, Vermont's legislative scheme deprives its districts of the capacity to raise additional funds for their sole use. *See* Vt. Stat. Ann. tit. 16, § 4027 (Supp.1997); *see generally,* Keon S. Chi & Cindy Jasper, *Reforming School Finance,* Solutions: Policy Options for State Decision–Makers, Oct. 1997.

### IV. Conclusion

To summarize, the legislation before us does not meet the requirements of Article XI because:

a) it is itself the cause of continued substantial disparities among districts;

b) the legislature may not delegate to the districts the responsibility to provide adequate capital facilities; and,

c) Article XI mandates adequate capital facilities statewide, and this legislation does not create, let alone meet, an adequate capital facilities standard.

We go as far as we go today in providing guidance at the request of the state legislator amici. A reasonable time has passed and it is now time to act. Choose a system that ensures adequate capital facilities statewide. Local control does not include the power to choose substandard facilities. Local control includes the power to choose facilities beyond the standard.

ZLAKET, C.J., and JONES, V.C.J., and FELDMAN, J., concur.

MOELLER, Justice, Dissenting.

My reasons for dissenting from the court's original opinion in this case have previously been noted and need not be restated here. *See Roosevelt Elem. School Dist. v. Bishop,* 179 Ariz. 233, 250–54, 877 P.2d 806, 823–27 (1994). When this court reviewed and rejected the 1996 legislative attempt to correct the constitutional problem perceived by the plurality, I did not renew my dissent in recognition of the fact that the plurality opinion had become final and it was clear that the 1996 legislative attempt was insufficient to meet the requirements of the plurality.

Because the majority's present opinion assures that this case will be returning to the superior court and to this court yet another time, I write separately and briefly to make two points.

First, because of the posture of this case, I believe the trial court, in effect, may have incorrectly placed the burden of proof on the governor. Given the fact that the plurality opinion had declared the capital funding system unconstitutional, it may well be that those who argued in support of the 1997 legislation could appropriately be charged with the burden of going forward with the evidence as an initial matter. *See Troutman v. Valley Nat'l Bank of Arizona,* 170 Ariz. 513, 517, 826 P.2d 810, 814 (App.1992); *Woerth v. City of Flagstaff,* 167 Ariz. 412, 419, 808 P.2d 297, 304–05 (App.1990). However, the ultimate burden of proof never shifts. *See Troutman,* 170 Ariz. at 517, 826 P.2d at 814; *Woerth,* 167 Ariz. at 419, 808 P.2d at 304. It must always remain on those who attack the constitutionality of statutes. *See Hall v. A.N.R. Freight System, Inc.,* 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986); *State v. Arnett,* 119 Ariz. 38, 48, 579 P.2d 542, 552 (1978); *Eastin v. Broomfield,* 116 Ariz. 576, 580, 570 P.2d 744, 748 (1977). I write in the hope that, when this case is returned to the superior court, the burden of proof will be clearly placed where it legally and properly belongs: namely, upon those challenging the constitutionality of the applicable statutes.

Second, it is becoming increasingly clear that it is going to be very difficult, if not impossible, to determine whether *any* legislative solution cures the constitutional defect

found by the plurality unless the legislation is permitted to operate for some period of time. Each time this case has come back to us for review, we have been presented with widely varying estimates of the statute's future effect. Given the deference properly due to legislation, it would be prudent to retain jurisdiction for a trial period to enable the court to review the constitutionality of legislation based on known facts, rather than upon the speculation of the parties. I opted for that approach in this instance. Having failed to convince my colleagues of its efficacy, I commend it to them and to the superior court when the case returns to court, as it now must.