Miriam FLORES, individually and as a parent of Miriam Flores, a minor child, et. al., Plaintiffs,

v.

State of ARIZONA, et. al., Defendants.

No. 92–596–TUC–ACM.

United States District Court, D. Arizona.

Jan. 24, 2000.

Lynne Christensen Adams, Office of Atty. Gen., Phoenix, AZ, for Eugene Hughes, David Silva, Claudine Bates Arthur, John Hosner, Ken Bennett, Ray Kellis, Morrison Warren, State of Arizona.

Elliott Talenfeld, Lynne Christensen Adams, Office of Atty. Gen., Phoenix, AZ, Gretchen Schneidau, Office of Atty. Gen., Phoenix, AZ, for Jim Allman.

Timothy Michael Hogan, Arizona Ctr for Law in the Public Interest, Phoenix, AZ, for Miriam Flores, Rosa Rzeslawski.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARQUEZ, Senior District Judge.

August 20, 1992, Plaintiffs filed this action seeking declaratory relief against the Defendants for failing to provide limited English proficient (LEP) children with a program of instruction calculated to make them proficient in speaking, understanding, reading, and writing English, while enabling them to master the standard aca-

demic curriculum as required of all students. *See Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (failure to provide English instruction to students of Chinese decent who do not speak English denies them a meaningful opportunity to participate in public education and violates Title VI, 42 U.S.C. § 2000d). Plaintiffs charge that the Defendants fail to adequately fund, administer and oversee the public school system in districts enrolling predominantly low-income minority children, and that Defendants allow these schools to provide less educational benefits and opportunities than those provided to students who attend predominantly anglo-schools.

On August 28, 1997, this Court certified the case as a class action law suit and defined the class as follows: all minority "at risk" and limited English proficient children (LEP), now or hereafter, enrolled in Nogales Unified School District (NUSD), as well as their parents and guardians." (Order filed August 28, 1997 at 4–5.)

After an arduous history, which has previously been described in detail (Order filed April 14, 1999 at 7–13), the Court dismissed Plaintiffs' claim under 42 U.S.C. § 1983, but held that Plaintiffs' LAU claims could proceed under the Equal Education Act of 1974 (EEOA), (Title 20 U.S.C. § 1703(f)),[1] and that Plaintiffs' disparate impact claim could be brought under the implementing regulations. ( 34 C.F.R. Part 100), for Title VI of the Civil Rights Act of 1964, (42 U.S.C. § 2000d).[2]

(Order filed April 14, 1999 at 2–7.) The Court set the matter for trial to determine whether Defendants fail to provide adequately for the instruction of LEP students and other "at risk" minority students attending public school systems in districts like NUSD. (Order filed April 14, 1999 at 11.)

The Court held a three-day bench trial, beginning on August 16, 1999. The parties presented live testimony and stipulated to admit into evidence all exhibits. The trial addressed only two specific issues because the parties reported that a Consent Decree disposed of the majority of Plaintiffs' LAU claims. (Minute Entry August 18, 1999.) The following issues were tried: 1) whether or not Defendants' adequately fund and oversee the LAU program in NUSD, and 2) whether or not the AIMS test disparately impacts minority students at NUSD. Plaintiffs' Second Amended Complaint did not include the AIMS challenge; nevertheless, the Court heard the parties' arguments and finds that Plaintiffs failed to present evidence at trial to make a prima facie case of disparate impact. Accordingly, the Court considers the evidence regarding academic performance only as it is indicative of deficiencies in Plaintiffs' education.

The cause having come to trial, before the Court sitting without a jury, with Timothy M. Hogan and William Morris appearing as counsel for Plaintiffs, and Roger W. Hall appearing as counsel for Defendants, the State of Arizona, et. al.;

---

1. The EEOA provides as follows:

    No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
    (f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

20  U.S.C. § 1703.

2. Title VI provides as follows:

    No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
    42  U.S.C. § 2000d.

The Court having heard the testimony and having examined the proofs offered by the parties, and having heard the arguments of counsel and being fully advised herein, the Court now finds generally in favor of Plaintiffs and against Defendants, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to Federal Rules of Civil Procedure, Rule 52(a) and (c) which constitutes the decision of the Court herein:

## FINDINGS OF FACT

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

1. The public elementary and secondary schools of Arizona, including NUSD, are financed by a combination of revenues from local, county, state and federal sources. Federal funding sources make up a very small percentage of total funds for Arizona's schools. For example in 1991–1992, federal revenues were only 6.5% of the State's total school revenues. In main part. Arizona School Districts are funded from local and state revenues. (Ps' Ex. 16: Borcher Report (1993).)

2. The minimum level of funding per student or (Base Revenue Control Limit (BRCL)) derives from a 1979–80 cost study which determined the amount of money being spent per student at that time. Transportation costs (Transportation Revenue Control Limit (TRCL)) are added to the BRCL to derive the revenue control limit (RCL) for each district, and then there are add-ons for capital outlay. There are two different funds for capital outlay. One is the Capital Outlay Revenue Limit (CORL) which may be spent on capital expenditures or shifted to maintenance and operations. The other is the Capital Levy Revenue Limit (CLRL) which is exclusively for capital improvements. (Day 1, TR at 4–50); (Ps' Ex. 16: Borcher Report (1993).)

3. Each district has a Revenue Control Limit (RCL), which is the sum of the BRCL and the TRCL (transportation funding, see ¶ 4). These funds and any CORL funds (capital outlay funding, see ¶ 4) which the district has shifted to operations make up the State guaranteed amount of operational funding for a school district. (Day 1, TR at 4–50); (Ps' Ex. 16: Borcher Report (1993).) Recent legislative changes to the State financing scheme, known as Students FIRST, provides more money for maintenance of buildings and additional technology and instructional materials. Funding increases from Students FIRST are largely capital in nature and NUSD did not experience any increase in its operational funding. (Day 1, TR at 31–34.)

4. The State's financing scheme is basically a foundation program, which means that the State guarantees a minimum level of funding for each student to ensure that each student receives a basic education.

5. The base level amount in 1992–1993 was $2,410.26 per student. (Day 1, TR at 35); (Ps' Ex. 16: Borcher Report (1993) at 6.) The legislature has increased the base level amount on an average of nine-tenths of a percent a year. (Day 1, TR at 35–36.) The inflation rate during the eight years has been an average of 2.8 % a year, or toughly three times more than funding increases by the State. (Day 1, TR at 35–36.) The current base level amount is approximately $3,174.11. (Day 1, TR at 17.)

6. Beginning in 1991–1992, the State legislature stopped funding the full inflation rate. In 1991–1992, the inflation rate was 4.1 %, but the State only gave an increase to the base support level of 1 %. (Day 1, TR at 29.)

7. In 1999–2000, the legislature increased the basic aid equal to the gross national product (GNP) which was 1.1 %, but because of population increases, the money went towards new student expenses rather than for increased aid per student. (Day 1, TR at 30.)

8. The State's finance formula increases the base amount by weighing certain factors such as type of student, experience of teaching faculty, size and type of school district, to derive the Base Revenue Control Limit (BRCL). (Day 1, TR at 4–50); (Ps' Ex. 16: Borcher Report (1993).) The amount of money school districts, such as NUSD, receive for maintenance and operations depends on the number of students in the district multiplied by the base levels set by the State.

9. The weighing factor for LEP was put in place in 1989–90 by the State legislature and is based on a cost study performed in 1987–88, which showed that on the average school districts were spending $450 per LEP student. (Ps Ex. 31: Review of Resources and Costs Associated with Services for LEP Students in Arizona by Arias and Shupp, March 12, 1998, at 23; *see also* Day 3. TR at 78; Romero testimony (LEP Cost Study of 1987–88 estimated an average total cost of $424 per student for LAU programs based on the amount of actual dollars the various districts were reportedly spending in 1987–1988 towards their respective programs.))

10. Ralph D. Romero, Director of Operations of the Division of Academic Support, previously Director of Academic Support, testified as to the possible deficiencies and problems with the LEP Cost Study prepared by the Department of Education in 1987–1988. (Day 3, TR at 66.) The cost study is not reflective of the actual cost of operating a successful LAU program for the following reasons: 1) the cost figures reported by the districts may not have been final audit figures and could

have been subject to change. (Day 3, TR at 67); 2) there may have not been uniformity in data collection, meaning that the districts may have differed in the way they categorized various program costs (for example, districts could have employees performing the same functions, i.e., administrative tasks, but categorized them differently, i.e., as teachers instead of as administrative staff) (Day 3, TR at 69); 3) the cost figure was deter mined by adding the year-to-date cost to an estimated cost for the program to the end of the fiscal year, (Day 3, TR at 71); 4) the cost of providing LEP students that are more proficient in the English language will be less than running a program in a district like NUSD where there are large concentrations of very limited English proficient students, (Day 3, TR at 72–73); 5) the districts operate many different types of LAU programs, including: English as a Second Language (ESL), bilingual transitional, and bilingual-bicultural, (Day 3, TR at 73); 6) some district LAU programs cost a lot per student and some cost very little, which suggests that the programs are very different. (Day 3, TR at 74); 7) there was no assessment made between the cost of a program and the quality of the program; and 8) certain conditions were not considered that may contribute additional significant costs. (Day 3, TR at 78).

11. The State has never updated nor revised the 1987–1988 LAU cost study. The State has not conducted a more accurate assessment of LAU program costs. The State legislature has ordered another cost study to be done this year. (Day 3, TR at 81.) The legislature created the English as a Second Language (ESL) and Bilingual Education Study Committee to conduct the cost study as follows: 1) determine the cost of educating LEP students versus what is currently being spent; 2) try to determine the best practices in bilin-

gual education and ESL; 3) look at ways to improve bilingual education in the school districts across the state, and 4) determine if programs are in compliance with state and federal mandates. (Day 3, TR at 81.)

12. In 1989-90, the LEP weight was .02, which meant that schools received approximately $50 more for each LEP student. In 1991-1992, the State legislature increased the weight to its current amount, .060, which results in approximately $150 being apportioned for each LEP student, (Day 1, TR at 25), and results in an increased BRCL for each LEP student A.R.S. § 15-943. For example, if the base level per student is $2,410.26, NUSD would receive an additional $144.62 for each LEP student. (Day 1, TR at 4-50); (Ps' Ex. 16: Borcher Report (1993).) The State provides school districts with funding in the form of block grants. There are no limitations or restrictions placed on the funding so a district may use the money as it sees fit. (Day 1, TR at 9, 13.) For example, a district may spend only $50.00 per LEP student on LAU programs, instead of the $150.00 allocated by the State, or it may exceed the State's minimum and spend more per LEP student. (Day 1, TR at 13.)

13. The State financing scheme provides for a portion of the school revenues to be raised at the district and county level. The State contributes the remainder. The local share is determined by the relative wealth of the district, as measured by assessed valuation per student, and then the State makes up the difference. (Ps' Ex. 16: Borcher Report (1993).) The tax rate is specified by the State legislature, (Qualifying Tax Rate) (QTR), which for a unified school district, like NUSD, is $4.40 per $100 of assessed property valuation (AV) in the school district. (Day 1,

TR at 4-50); (Ps' Ex. 16: Borcher Report (1993).)

14. NUSD determines its financial responsibility as follows: 1) NUSD assessed valuation of $90,992.662 for 1998; 2) NUSD has 5,889 students; 3) assessed valuation per student (A-V per student) is determined by dividing the assessed valuation for NUSD by the number of students in NUSD ($90,992,662 ÷ 5,889 = $15,451.29 A-V per student); 4) NUSD's contribution per student is calculated by multiplying the A-V per student by the QTR for NUSD (($15,451.29 ÷ 100)[3] X $4.40 = $679.86 per student); 5) the State's contribution per student is calculated by subtracting NUSD's contribution per student from the base support level, which is currently $3,174.11 per student ($3,174.11—$679.86 = $2,494.25). Total contributions are calculated by multiplying the respective per student contributions by the number of students (($2,494.25 X 5,889 = $14,688,638.00 in state funding) ($679.86 X 5.889 = $4,003,695.50 in local funds)). (These figures are examples only and do not reflect the exact per student allocation which would be adjusted by the weighting factors, pursuant A.R.S. § 15-943.) (Day 1, TR at 4-50); (Ps' Ex. 16: Borcher Report (1993).)

15. Above and beyond the State guaranteed minimum, School districts can increase their operational budgets by up to 10 % more than the RCL, by voter approved spending changes known as "overrides." (Day 1, TR at 4-50); (Ps' Ex. 16: Borcher Report (1993).)

16. A high-valuation district can generate override money with little additional tax burden to its residents as compared to low-valuation districts. For example, NUSD can raise $1,600,000.00 in an override, based on their assessed valuation of

**3.** QTR = $4.40 per $100 of assessed value.

$90,992,662.00, by imposing a tax of $1.83 on every $100 of assessed value; whereas, Catalina Foothills Unified School District which is a high-valuation district, can raise the $1,600,000.00 by imposing a tax of $.56 on every $100 of its $285,270,808.00 assessed valuation. (Day 1, TR at 4–50); (Ps' Ex. 16: Borcher Report (1993).)

17. The impact of financing LAU programs via an override is greater in low-valuation districts because they have heavier concentrations of LEP students as compared to high-valuation districts. For example, based on 1998 figures, NUSD could increase LEP funding by $350.00 per student, by passing an override for $1.83 per $100 of assessed value to raise $1,662,500.00 because it has 4,750 LEP students; whereas, Catalina Foothills Unified School District could increase its funding by $350.00 per student, by passing an override for a $.07 to raise $21,000.00 because it only has 60 LEP students. (Day 1, TR at 27–28.)

18. Dr. Sidney D. Borcher's Report sampled 18 districts. He found that twice as many high assessed valuation districts (12) have passed overrides as compared to low assessed valuation districts (6), (Ps' Ex. 16: Borcher Report (1993) at 24, 25: Table 13), and that only high assessed valuation districts had overrides generating funding to the maximum limit. (Ps' Ex. 16: Borcher Report (1993) at 19, 25 Table 13.) Dr. Borcher testified that lower wealth districts have a hard time passing an override because they already have a very high tax rate, and even though the constituency maybe sees the need for better education, they just say we can't afford it. (Day 1, TR. at 47.)

19. NUSD does not have an override. (Day 1, TR at 26.)

20. Without a voter approved override, NUSD can only increase LEP funding by shifting money from non-LEP student apportionments. For example, funding NUSD's LEP program at $450 per LEP student results in a loss of $270.00 to each regular student, (Day 1, TR at 37), from the regular program's operating budget. The shifting of funds to LEP programs, therefore, impacts all students because it results in a lower base level of financial support for all students, including LEP students. (Day 1, TR at 38). This is typical for a low assessed valuation district where on the average it will take approximately $112.00 to generate $450 per LEP student; whereas, a high assessed value district could accomplish the same level of funding with only a $13.00 loss per student. (Ps' Ex. 16: Borcher Report (1993) at 32; Table 18.)

21. Low-valuation districts also have heavier concentrations of "at risk" students than high-valuation districts. An "at-risk" student is a student who usually has some socioeconomic type of impact that would cause them to be "at risk" of not learning. (Day 1, TR at 38–39.) The most common accepted measurement in education for determining "at risk" students is the number of students that qualify for free or reduced lunches, which is primarily an economic measurement. (Day 1, TR at 39.) The State does not provide funding for "at risk" students. (Day 1, TR at 39.) "At risk" student programs are not included in the list of special needs weighted for additional funds by the State. A.R.S. § 15–94–43. Federal programs, primarily through Title 1, provide funding for "at risk" students and this funding makes up approximately 4 % of the State's total budget for Arizona schools. (Day 1, TR at 36, Day 1. TR at 40; BR at 3.)

22. Districts with high enrollments of LEP students also tend to have a high percentage of reduced lunch programs. (Ps' Ex. 16: Borcher Report (1993) at 31: Table 17). This is not always true. (Day

1, TR at 45.) For example, inner-city schools have "at risk" students who speak only English and receive free and reduced lunches. (Day 1, TR at 45.) Responding to questioning by the State's attorney, Dr. Borcher testified that the correlation exists in NUSD, where LEP students are the same students that make up the bulk of the "at risk" student population enrolled in the free-lunch programs, because these students come from non-English speaking immigrant families from Mexico whose parents have low paying jobs. (Day 1, TR at 43–44.)

23. Ann Elizabeth Doan, Director of Bilingual Education and Curriculum for NUSD, testified that in 1992, the Office for Civil Rights conducted a LAU compliance review which resulted in a lengthy report on the status of NUSD's LAU programs and a LAU compliance agreement (OCR Compliance Agreement) to remedy the following problems: 1) clean up the process of identifying LEP students so that state accepted measures were being used; 2) place the student in a LAU program, when the child was identified as a LEP student; 3) the LAU program could be bilingual education. English as a Second Language (ESL), or an individual education program (IEP); if the LEP student was a special education student, LAU provisions had to be included in the student's special education LEP; 4) monitor LAU program to ensure program sufficiency and to show that the program actually improves the student's academic level and English skills; 5) review LAU program exiting process; and 6) follow up exited LEP students to insure that students continue to work at grade level. (Day 2, TR at 7–8.)

24. A key element to implementing the OCR Compliance Agreement required NUSD to secure qualified LEP teachers. (Day 2, TR at 7–8.)

25. Teachers are qualified LEP instructors if they have a bilingual endorsement. This endorsement requires a teacher to know Spanish. To teach in a bilingual classroom, the teacher must pass a test at a state university which shows they have an academic level of Spanish. (Day 2, TR at 23.)

26. Teachers are qualified LEP instructors if they are ESL endorsed. The teacher does not particularly have to know Spanish, but at some point in time should have learned a second language, such as French, German, etc., so that the teacher knows the process that children go through to learn a second language. (Day 2, TR at 23.)

27. NUSD has adopted a bilingual education program and an ESL program. (Day 2, TR at 10.) The goal of NUSD's bilingual program is for students to graduate from highschool proficient in both English and Spanish, meaning able to read, write and speak both English and Spanish. (Day 2, TR at 10.) The goal of the ESL program is to teach enough English so that the student can be mainstreamed into a grade level classroom and function in English with additional support, so that the student maintains his or her grade level in content area skills. (Day 2, TR at 17.)

28. The State provides that the decision regarding which type of LAU program to implement is made by the school, so some schools in NUSD have adopted bilingual programs, and others use ESL programs. (Day 2, TR at 25.)

29. NUSD has six elementary schools, two middle schools, one highschool, and an alternative highschool. (Day 2, TR at 9.) The student population of approximately 5,889 students is approximately 95 % Hispanic. (Day 2, TR at 15.) Approximately, 60 % of the student body is LEP and 63 % receive free and reduced lunches. (P's Ex. 16: Borcher Report (1993) at 31: Table 17.)

30. There are approximately 2,500 to 2,800 students enrolled in NUSD elementary schools. Approximately, 80 % of the elementary students are classified as LEP, and approximately 95 % of LEP students are from Mexican–American homes. (Day 2, TR at 9, TR at 15.)

31. NUSD elementary schools use a transitional bilingual education model. Students which mainly speak Spanish are placed in classrooms where they're taught to read and do math in Spanish while they're learning English. There are special classes in kindergarten through 6th grade to teach English. As soon as a student has command of oral English, he or she is put in an all English program, (Day 2, TR at 10), even though the child may not be academically literate in English. In other words, a student is still LEP because he or she cannot read or write proficiently in English, but once oral skills are acquired the student is mainstreamed.

32. Ideally, all LEP students not in ESL classes are supposed to be taught in the mainstream classrooms by LEP endorsed teachers, with half the teachers being bilingual and the other half being ESL endorsed. Between 500 to 1,000 of the 2,700 elementary students are not with endorsed teachers, so the schools do a lot of student-teacher exchanging to enable students to be with an endorsed teacher at least for some part of each day. (Day 2, TR at 11.)

33. The typical total enrollment in a primary classroom to which LEP students are assigned ranges from 20 students, which is good, to 30 students in a classroom. NUSD cannot reduce LEP class sizes because there are not enough classrooms and there are not enough teachers. (Day 2, TR at 12–13.) To adequately implement the transitional bilingual education program at the elementary level, NUSD needs at least 60 more teachers with either bilingual or ESL endorsements. (Day 2, TR at 14.)

34. There are approximately 1,500 students enrolled in NUSD middle schools. Approximately, 70 % of the middle school students are classified as LEP, and approximately 95 % of the LEP students are from Mexican–American homes. (Day 2, TR at 15.)

35. NUSD middle schools use an ESL model. (Day 2, TR at 15.) The program focuses on "newcomers," meaning students who have recently immigrated from Mexico. (Day 2, TR at 16.) There are approximately 100 "newcomer" students. These students are placed in self-contained ESL classrooms most of the day to learn English. At the same time, they're assigned to social studies, science, and math teachers that have some training in sheltered English instruction to learn the content areas and at the same time develop English language skills. (Day 2, TR at 16); (Day 2, TR at 30.) There are also LEP students who have been in the district one to four years, but NUSD does not have enough qualified teachers to provide all LEP students with LAU instruction. Therefore, it focuses on teaching the "newcomers" English. (Day 2, TR at 19.)

36. The majority of LEP students in NUSD middle schools are *not* in ESL programs, but are mainstreamed because the State allows students who can communicate orally in English to be placed in mainstream, English only classrooms. These students are LEP because they are not English literate; they do not read nor write at or near grade level. They could be one, two, three, even four or five years behind their peers, but according to the State they don't belong in an ESL classroom. (Day 2, TR at 17.)

37. If mainstreamed, these LEP students require English language support in their mainstream classroom. The main-

stream classroom teachers should be language endorsed so that they are trained in different strategies, such as sheltered English and cooperative learning, to provide language support for the students who are learning content area skills. (Day 2, TR at 18.) Mainstreamed LEP students in NUSD middle schools do not receive any English language development instruction in the course of a given school day. (Day 2, TR at 20.)

38. To comply with State regulations, NUSD does a lot of student-teacher exchanging so that at some part of the day the LEP students will have a teacher with a language endorsement, who can provide additional support. "Additional Support," however, is not defined. It doesn't mean specifically English language development. If a student is slipping academically, there should be knowledge that the student is LEP, and the teacher should provide either extra tutoring or adapt the instruction for that student. NUSD doesn't know whether this actually happens, but it could happen during the one period per day that the student is with the endorsed teacher. (Day 2, TR at 20–22.)

39. NUSD has approximately 300 middle school teachers. Only 140 are language endorsed; 160 have no endorsement. Over half of NUSD's teachers are not qualified to work with NUSD's LEP students. (Day 2, TR at 32.) To actually implement the ESL program in its middle schools, NUSD needs approximately 160 more LEP endorsed teachers, with approximately half being bilingual and half being ESL endorsed. (Day 2, TR at 22.)[4]

40. There are approximately 1,800 students enrolled in the highschool. Approximately, 65–70 % of the students are LEP, (Day 2, TR at 41–42), and approximately 95 % of the LEP students are from Mexican–American families. (Day 2, TR at 15.)

41. There are approximately 130 students enrolled in the alternative highschool. Approximately, 98 % of these students are LEP. (Day 2, TR at 41.)

42. The highschool uses an ESL model. New students that have been in the United States one to three years are placed in self-contained ESL classrooms where they learn English. "Newcomers," usually from Mexico, are generally advanced in math and science, so NUSD attempts to have qualified bilingual math and science teachers to teach grade level content area skills, while the students learn English (Day 2, TR at 42.) LEP students, new or otherwise, who have oral English skills are put into mainstream classrooms, even if they do not have English reading or writing abilities. (Day 2, TR at 43.) These students should be in classrooms with LAU endorsed teachers, (Day 2, TR at 44); (Day 2, TR at 49–50), but they are not, - there is no attempt to provide English language development instruction for these LEP students during a typical school day. (Day 2, TR at 45.)

43. LEP students that are not proficient in reading or writing English should be enrolled in what NUSD calls LEP English, or English B, to give them additional support in English language development. (Day 2, TR at 46.) Most of the non-newcomer LEP students at the highschool are, however, in mainstream English classes because there are not enough English B classes. To increase the English B classes, NUSD needs smaller class sizes, more classrooms, additional materials that are adapted to students learning the English language, and qualified teachers. NUSD's mainstream English teachers

**4.** On cross-examination, Ms. Doan testified that the 160 included the 60 teachers needed at the elementary level. (Day 2, TR at 103.)

need to be trained to work with second language populations and help students develop their English literacy skills, not just their highschool English skills. (Day 2, TR at 47.)

44. Generally, only "newcomer" LEP students can enroll in bilingual math classes, but non-"newcomer" LEP students, having only oral English skills, should also be enrolled in these classes. NUSD students do very poorly on normed reference national tests in math because the tests are very content specific, meaning they contain a lot of vocabulary and a lot of grade level reading. If a student is not literate in English, meaning they are not proficient at reading and writing English, they will need a lot of support through their math classes to pass the English-only math tests. (Day 2, TR at 48.)

45. NUSD's bilingual math class and science class are designed to impart content skills, not to develop English language skills. (Day 2, TR at 52–53.) There is no bilingual social studies class, but NUSD has social studies teachers with bilingual endorsements whom adapt their teaching to the needs of LEP students. (Day 2, TR at 53.) NUSD utilizes emergency teaching certificates to employ non-English speaking teachers to teach LEP students in the various content areas. These teachers are not tested to determine whether they are proficient in speaking, reading, and writing English. (Day 2, TR at 52.) These teachers teach in classes designed to make content areas understandable to LEP students. The classes are not designed to develop the students' English language skills. (Day 2, TR at 52–53.)

46. LEP students who have been exited from the LAU program are reassessed every two years. If the student scores at the 35th percentile or below on the English reading test, he or she should be placed in a class with a language endorsed teacher, but this is not possible in NUSD because of the teacher shortages at every grade level in NUSD. Instead, NUSD notifies the teacher that the student needs additional support, and the teacher is asked to help. If the student is in a classroom with an untrained teacher, he or she will probably not get any help. (Day 2, TR at 79.)

47. There are teachers available in the labor market to hire, but NUSD does not have enough money to hire the number of teachers it needs. NUSD's current salary level is not competitive enough to keep endorsed teachers or to hire new endorsed teachers. (Day 2, TR at 33.)

48. Since entering into the OCR Compliance Agreement, staffing at NUSD has gotten worse. NUSD loses approximately 5 to 15 language endorsed teachers per year. Since the OCR Agreement, NUSD has lost approximately 40–60 language endorsed teachers, approximately 25 of these teachers taught at the elementary level. (Day 2, TR at 33–34.)

49. As part of the OCR Agreement, NUSD adopted a policy that all newly hired teachers be language certified or agree to obtain the endorsement within three years of their being employed by NUSD. (Day 2, TR at 36–37.) NUSD dropped the requirement because it was too burdensome, (Day 2, TR at 37), even though NUSD paid the cost of certification classes up front, and allowed the teacher to repay the district after he or she acquired provisional bilingual endorsement and received an $800.00 addendum from the district for having obtained the certification. (Day 2, TR at 37.) NUSD dropped the $800.00 addendum program when it dropped its requirement that newly hired teachers become language endorsed. (Day 2, TR at 38.)

50. NUSD offers ·a $2,000 stipend per year for language endorsed teachers, but

this primarily operates to attract new teachers because even with the stipend, language endorsed teachers can make more money in other districts. (Day 2, TR at 35.) Other school districts with higher salary ranges actively recruit NUSD's language endorsed teachers. (Day 2, TR at 35.) NUSD has a beginning salary schedule competitive with other school districts, but as time goes on, the increases for teachers that work for NUSD do not keep pace with increases available in other school districts, so NUSD may be able to attract teachers at the onset, but can't keep them. (Day 2, TR at 108.)

51. NUSD arranged with Northern Arizona University, Nogales satellite campus, to offer the six or seven courses required for bilingual and ESL endorsements. (Day 2, TR at 39–40.) The University of Arizona does not have a satellite program for teachers wishing to be certified by the U of A, and it is impractical to drive to Tucson after the school day is over to attend afternoon classes at the university. (Day 2, TR at 38.) NUSD contracts with Cal. State Fullerton to train its teachers on how to develop academic English and academic competence across the curriculum, the development of literacy in content areas, and the development of proper assessments for language minority students. The Cal. State Fullerton program does not provide language endorsements for NUSD's teachers, but it does give them the type of training they need to work with LEP students. (Day 2, TR at 57.)

52. The State has never provided NUSD with any form of assistance designed to increase the number of newly hired teachers having language endorsements, nor provided any form of assistance designed to increase the number of current faculty who obtain language endorsements. Instead, the State tells other districts no look to NUSD for trained and qualified teachers. (Day 2, TR at 15.) Except for the State's base level funding for NUSD (Group B funds), the State does not provide any assistance regarding implementation or operation of NUSD's LAU program. Specifically, the State does not provide money, training programs or materials, or technical assistance. (Day 2, TR at 40–41, 53, 54, 58.)

53. Other LAU program inadequacies, besides qualified faculty, are as follows: 1) NUSD needs additional classroom space to reduce class size; 2) NUSD needs materials for both language groups; 3) NUSD needs to train its teachers to work with the LAU Program materials; 4) NUSD needs ESL materials, especially to teach language skills in content areas, such as English, social studies, science, and math; 5) NUSD needs to train its teachers to implement a special math program; 6) NUSD needs to train parents to help their children in the classroom; 7) NUSD needs to pay extra for its teachers to work after school hours with parents and students, and 8) NUSD must also provide transportation for after school tutoring and parent training programs. (Day 2, TR at 59–61.)

54. Ms. Doan testified that NUSD spends more on its LAU programs than the amount of Group B money provided by State. (Day 2, TR at 64.) To acquire funding for the LAU program, NUSD robs from Peter to pay Paul. (Day 2, TR at 62.)

55. Ms. Doan has a budget of $16,000 to implement necessary upgrades to NUSD's LAU programs. (Day 2, TR at 63.) She prepared a budget totaling $500,000 to $700,000 to upgrade the LAU program to include the following: 1) NUSD would cover the cost for its teachers to acquire language endorsements; 2) NUSD would pay teachers to tutor students after school; 3) NUSD would hire outside people to tutor students; 4) NUSD would purchase LAU program materials,

including testing materials to use to assess students; 5) NUSD would provide teacher training on the use of the LAU materials; and 6) NUSD would hire employees to conduct the testing, including the initial LEP assessment, reassessment, and the follow-up. (Day 2, TR at 62–63.)

56. NUSD receives the following federal grant money for LAU programs: 1) Nogales Highschool, last year of Title 7–five–year grant, which provides LEP students with language support to work at grade level; 2) Wade Carpenter Middle Academy of Technology, last year of Title 7–five–year grant, which provides $250,000 per year to the highschool and $300,000 a year to the middle school for staff training and to get teachers language endorsed; 3) Wade Carpenter Middle School, first year of Title 7–two–year grant, which provides $125,000 per year to develop inner session programs for LEP students; 4) the alternative highschool has an academic and technology grant; 5) Lincoln Elementary, last year of Title 7–five–year grant which provides $310,000 per year for computers, teacher training and language endorsements. The federal government contracts directly with the individual schools for these grant programs. The schools must use the money as stipulated in the grant, and the district cannot use the money to supplement the regular LAU budget. (Day 2, TR at 65–69.)

57. The goal of all the federal grants is, number one, to develop the English skills of the student, and number two, to develop the academic skills of the students. At the end of this school year, NUSD will lose three of the federal LAU grants for a total dollar loss of between $800,000.00 and $1,000,000.00. (Day 2, TR at 69.) The consequences of these grants ending will be significant because the federal money has supported the acquisition of language endorsements for NUSD teachers and training for teachers that do not have endorsements. (Day 2, TR at 70.)

58. Securing new federal grants for LAU programs is unlikely because they are highly competitive. (Day 2, TR at 71.) Only about 10 % of federal grant proposals across the country are funded. (Day 2, TR at 72.) There are no state funds to replace the federal grants which are ending this year. (Day 2, TR at 71.)

59. NUSD finances its "at risk" programs through Title 1. (Day 1, TR at 38.) All NUSD schools qualify for Title 1 funds for "at risk" students. In districts like NUSD, which are below the poverty level, Title 1 funds must be used for school-wide improvements rather than targeted on "at risk" students. (Day 2, TR at 88); (Day 2, TR at 93–94, 96.) NUSD has school-wide Title 1 programs at all levels: elementary, middle school, and highschool. (Day 2, TR at 90–91.) At the elementary school level, Title 1 funds provide for all day kindergarten which enables the students to acquire academic skills at a faster pace; at the middle school level, the money goes to fund parent involvement programs, math and reading programs (Day 2, TR at 94); and the highschool spends money on parental involvement programs, tutoring for students, computer labs, and extended day classes (Day 2, TR at 95).

60. There is a direct correlation between the LEP student population and "at risk" students in NUSD. The State and NUSD have developed measurements for assessing the success of Title 1 programs. AIMS is one measurement the state uses to determine success, and it also uses an independent testing company to administer a normed reference test. (Day 2, TR at 96.) NUSD has had a transitional district assessment plan in place since 1994 to test reading, writing, and speaking in English and Spanish. The tests show that the Title 1 programs for "at risk" students

are succeeding slowly. (Day 2, TR at 97.) NUSD students are below grade level, so its not enough to make one year's progress in one year, the students must make more than one year's progress in one year to ever catch up. NUSD students have not been able to do that despite Title 1 efforts. (Day 2, TR at 97.)

61. The Court finds that because of the overlap between NUSD's LEP students and "at risk" students, the Title 1 "success" assessments are most likely reflective of NUSD's LAU program's success or lack thereof.

62. The OCR has not sent anybody to monitor NUSD regarding the success of its LAU programs since institution of the 1992 OCR Agreement. (Day 2, TR at 81.) The last State monitoring visit at NUSD was in 1993. (Day 2, TR at 83.) Prior to that, the State monitored NUSD in 1991. The OCR visit and the State's visit in 1991 resulted in significant improvements to NUSD's LAU program. (Day 2, TR at 83.)

63. The State implemented an active monitoring program in 98–99. The first spring semester of the academic year 1998–1999, the State monitored five school districts and is continuing the monitoring this semester so that approximately one district a month is monitored. The State believes that with year round school, it can continue monitoring during the summer. There are 460 districts. The State conducts on-site monitoring which takes about three days and follow-up monitoring which is approximately two days. The State has sent a monitoring guide to each district to explain state compliance mandates. (Day 3, TR at 82–83.) The State has not yet monitored NUSD.

64. Plaintiff's expert Dr. Gene Glass testified that minority students fail standardized tests such as AIMS and Sanford 9 in dramatically larger proportions than anglo students. He based his opinions on data compiled for Phoenix Union Highschool District (PUSD), which is not at all similar to NUSD and, therefore, does not provide a meaningful comparison. While both schools have similarly high indices for "at risk" students, (Day 2, TR at 25), (Day 2, TR at 42), the two schools are however, entirely different. PUSD is a large urban school in a high assessed valuation district. PUSD has a racially diverse student body which is comprised of Anglo, Black and Hispanic students. NUSD is a low assessed valuation district. NUSD's student body is 95 % Mexican–American, and only 1 % of the students are Black. (Day 2, TR at 108.) NUSD has 63 % of its student body in its free and reduced lunch program, and a corresponding LEP population of 60–70 %. (P's Ex. 16: Borcher Report (1993) at 31: Table 17.) PUSD has approximately 40 % of its student body in the free and reduced lunch program, but only has a LEP population of 7 %. (P's Ex. 16: Borcher Report (1993) at 31: Table 17.) Plaintiffs' expert failed to consider these demographic differences and concluded that they were irrelevant. This approach made his testimony of little use to the Court for the purpose of establishing whether minority students fail standardized tests because of their race, national origin, limited English proficiency, because they attend schools in low valuation districts, for some other socio-economic reason, or for some combination of all these factors.

## CONCLUSIONS OF LAW

To the extent any of the Findings of Fact contain or include any Conclusions of Law, said Findings of Fact are incorporated herein by reference. Furthermore, this Court provided a detailed discussion of the applicable law in its prior Order of April 14, 1999, which is incorporated herein by reference.

## A. LAU Resource Issue

1. The Court's inquiry is three-fold:

The court's responsibility, insofar as educational theory is concerned, is only to ascertain that a school system is pursing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy.

The court's second inquiry would be whether the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school. We do not believe that it may fairly be said that a school system is taking appropriate action to remedy language barriers if, despite the adoption of a promising theory, the system fails to follow through with practices, resources and personnel necessary to transform theory into reality.

... If a school's program, although premised on a legitimate educational theory and implemented through the use of adequate techniques, fails, after being employed for a period of time sufficient to give the plan a legitimate trial, to produce results indicating that the language barriers confronting students are actually being overcome, that program may, at that point, no longer constitute appropriate action as far as that school is concerned....

(See Order filed April 14, 1999 at 15–16 (citing Castaneda v. Pickard, 648 F.2d 989, 1009–1010) (5th Cir.1981)).

2. Local school boards are responsible for the operation of schools, but they must comply with controls over financing and spending prescribed by the Arizona legislature. (Ps.' Ex. 16: Borcher Report (1993).)

3. The parties agree that the State of Arizona has prescribed, and NUSD has adopted, models that are generally regarded by experts as sound designs for effective LAU instruction. The State's system passes the first test under Castaneda in this regard.

4. For the State to adopt appropriate practices and allocate adequate resources, it must first establish minimum standards for providing LAU funding and program oversight. (See Order filed April 14, 1999 at 14 (citing Roosevelt II, 190 Ariz. 520, 950 P.2d 1141, 1145 (1997) (performing an equal protection analysis, the Roosevelt Court held that it could only determine the adequacy of the State's program once a minimum standard had been set))).[5]

5. The State has established minimum academic standards, which are promulgated as the revised Arizona Essential Skills (AES). The State developed a corresponding test for measuring attainment of the skills, which is the Arizona Instrument to Measure Skills (AIMS). The Arizona Essential Skills are the minimum standards which must be taught in all schools and which all students, including LEP students, must master.

■ 6. The State has established a "minimum" base level amount for the LAU program of approximately $ 150.00 per LEP student, pursuant to the State's weighting of 0.060 under A.R.S. § 15–943. Since 1991–1992, the State legislature has failed to account for inflation in its base level allocation for LEP students. The State's LAU program funding formula was

---

**5.** *Roosevelt Elementary School District No. 66 et al. v. C. Diane Bishop, (Roosevelt I)* 179 Ariz. 233, 877 P.2d 806 (1994) (en banc), *appeal after remand. Hull v. Albrecht, (Roosevelt II)* 190 Ariz. 520, 950 P.2d 1141 (1997), *appeal after remand (Roosevelt III)* 192 Ariz. 34, 960 P.2d 634 (1998) (equal protection analysis applied to claim that Arizona's school financing scheme violated the General and Uniform Clause of the Arizona Constitution).

derived from, but is less than the 1987–1988 estimate that an average LAU program costs at least $ 450.00 per LEP student. The State admits that the LAU program costs in the 1987–1988 study are unreliable, but the State has failed to update its 1987–1988 cost study, nor has the State conducted any other studies to more accurately determine the actual cost per student for LAU instruction. The Court finds that the $450 estimated LAU program cost, on which the State's minimum $150 appropriation is based, is arbitrary and capricious.

7. The State's minimum $150 appropriation per LEP student, in combination with its property based financing scheme, is inadequate and has resulted in the following LAU program deficiencies: 1) too many students in a class room, 2) not enough class rooms, 3) not enough qualified teachers, including teachers to teach ESL and bilingual teachers to teach content area studies, 4) not enough teacher aids, 5) an inadequate tutoring program, and 6) insufficient teaching materials for both ESL classes and content area courses.

8. The State does not provide any other forms of in-kind assistance to offset the base level deficiency. The State has not designed any programs, nor implemented any practices, nor committed any resources which would supplement or supplant district level services. The State has not assisted NUSD in any way in increasing LAU endorsed teachers. Since 1992, the State has not provided any LAU monitoring or oversight to assist NUSD in improving its LAU program.

9. The State's minimum base level for funding LAU programs is arbitrary and capricious and bears no relation to the actual funding needed to ensure that LEP students in NUSD are achieving mastery of its specified "essential skills." *See* (Order filed April 14, 1999 at 14–15 (citing *Roosevelt II,* 950 P.2d at 1145 (dollar amount chosen by legislature is arbitrary and capricious because it bears no relation to actual need))). The State is currently conducting a study to more accurately assess LAU Program costs which might well provide a basis for the State to set a minimum base funding level per LEP student which would not be arbitrary and capricious.

10. Defendants are violating the EEOA because the State's arbitrary and capricious LAU appropriation is not reasonably calculated to effectively implement the LAU educational theory which it approved, and NUSD adopted.

11. Defendants are violating the EEOA because the State has failed to take appropriate action to remedy language barriers in NUSD, in that, despite the adoption of a recognized LAU program in NUSD, the State has failed to follow through with practices, resources and personnel necessary to transform theory into reality.

*B. Title VI of the Civil Rights Act of 1964; 42 U.S.C. § 2000d*

1. Plaintiffs allege a violation of Title VI's implementing regulations which prohibit any recipient of federal funding from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." 34 C.F.R. § 100.3(b)(2). Under Title VI's implementing regulations, proof of discriminatory intent is not a prerequisite to a private cause of action against governmental recipients of federal funds. Proof of discriminatory effect suffices to establish liability under the regulations. (*See* Order filed April 14, 1999 at

**1240**

17 (citing *Larry P. by Lucille P. v. Riles,* 793 F.2d 969, 981–82 (1984) (en banc), *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986–987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).))

2. To establish a prima facie case of disparate impact, Plaintiffs must establish that the AIMS test will have a distinctly disproportionate and adverse impact on minority students in NUSD; the AIMS graduation test causes the disparity, and that the disparity falls on Plaintiffs because they are members of a protected group. Plaintiffs rely solely on the evidence presented by its expert witness, Dr. Glass, who testified that minority students in PUSD disproportionately fail standardized tests, like the AIMS test, when compared to Anglo-students. The Court rejects this evidence as not being a relevant comparison for students in NUSD. Specifically, the evidence fails to establish the necessary causal link between the disparate impact of the tests and the Plaintiffs' minority status. The correlation that exists in NUSD between "at risk" students and LEP students destroys any race-based inferences that might otherwise be drawn. Based on the evidence presented at trial, the students at NUSD might very well fail the tests because they are low-income "at risk" students. Members in this group are not protected from discriminatory treatment. *See* Order filed April 14, 1999 at 19–20 (relying on *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir.1990) (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. at 985–988, 108 S.Ct. 2777) (to prove causation, plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group)). Plaintiffs fail to establish a prima facie case of disparate impact.

Accordingly,

**IT IS ORDERED** that the Court finds in favor of Plaintiffs on Count One of the Second Amended Complaint that Defendants are violating the EEOA, (20 U.S.C. § 1703(f)), and against Plaintiffs on the Title VI claim, (34 C.F.R. Part 100), (42 U.S.C. § 2000d), challenging the AIMS test.

**IT IS FURTHER ORDERED** that no further issues having been brought before this Court for disposition, the Clerk of the Court shall enter judgment accordingly.