960 P.2d 634

Governor Jane Dee HULL, Intervenor/Petitioner,

v.

Hon. Rebecca A. ALBRECHT, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

and

Roosevelt Elementary School District No. 66, et al.; Lisa Graham Keegan, Superintendent of Public Instruction; State Board of Education; State of Arizona, Real Parties in Interest,

Gilbert Unified School District No. 41; Murphy Elementary School District No. 21; Phoenix Union High School District No. 210; John J. Hester; Duane Standage; William Emory Grimes; Karen G. Moore; Paradise Valley Unified School District No. 69; Pendergast Elementary School District No. 92; Madison Elementary School District No. 38; Scottsdale Unified School District No. 48; Phoenix Elementary School District No. 1, Intervenors.

No. CV–98–0238–SA.

Supreme Court of Arizona, En Banc.

June 16, 1998.

Fennemore Craig by Timothy Berg, Janice K. Procter–Murphy, Paul J. Mooney, Phoenix, for Intervenor/Petitioner Governor Jane Dee Hull.

Arizona Center for Law in the Public Interest by Timothy M. Hogan, David S. Baron, Jennifer B. Anderson, Phoenix, for Real Parties in Interest Roosevelt Elementary School District No. 66, et al.

Grant Woods, Attorney General by Sydney K. Davis, Assistant Attorney General, Phoenix, for Real Parties in Interest Lisa Graham Keegan, Superintendent of Public Instruction; State Board of Education; State of Arizona.

Osborn Maledon, P.A. by Andrew D. Hurwitz, G. Murray Snow, Phoenix, for Intervening School Districts and Voters.

Thomas W. Pickrell and Helm & Kyle, Ltd. by John D. Helm, Roberta S. Livesay, Phoenix, for Amicus Curiae Arizona School Boards Association, Inc.

OPINION

PER CURIAM.

¶ 1   The Governor of Arizona brought this petition for special action against the Roosevelt Elementary School District and other districts, the Superintendent of Public Instruction, and the State Board of Education, asking that this court (1) declare that the Students FIRST Act of 1998 complies with the state's constitutional obligation to fund a general and uniform school system; and (2) vacate the superior court's order prohibiting the state from distributing funds to Arizona's public school system after June 30, 1998.   For the reasons set forth below, we accept jurisdiction, grant relief in part, and deny relief in part.   We also modify the superior court's order of November 19, 1996, and extend by sixty days from the date of

this opinion the time during which the state can distribute funds to the public school system.

## I. FACTS AND PROCEDURE

¶ 2 This is the fourth time this litigation has required us to decide whether the legislature has met the mandate of the Arizona Constitution to provide a general and uniform public school system. *See* Ariz. Const. art. XI, § 1 ("The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system...."). In *Roosevelt Elementary School District No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994), we held that the existing school financing system did not comply with the general and uniform requirement because its heavy reliance on local property taxation, combined with arbitrary school district boundaries and lack of meaningful equalization, directly caused substantial capital disparities among school districts. *Id.* at 242, 877 P.2d at 815.

¶ 3 In 1996, the legislature approved an amended system based on the same overall scheme we rejected in *Roosevelt*. The superior court held that the new scheme did not comply with *Roosevelt*, and entered an order prohibiting the state from funding public schools unless a constitutional system was in place on or before June 30, 1998. We agreed with the trial court and affirmed its order. *See Symington v. Albrecht*, No. CV–96–0614–SA (Ariz. Jan. 15, 1997) (Supreme Court Order).

¶ 4 The legislature responded in 1997 with the Assistance to Build Classrooms Fund ("ABC legislation"). We rejected the ABC legislation in *Hull v. Albrecht*, 190 Ariz. 520, 950 P.2d 1141 (1997). We held that the ABC legislation did not comply with Article XI, Section 1, because it continued to cause substantial capital facility disparities between districts, improperly delegated to the school districts the state's responsibility to maintain adequate facilities, and failed to provide minimum adequacy standards for capital facilities. *Id.* at 523–24, 950 P.2d at 1144–45.

¶ 5 The legislature's most recent attempt to create a constitutional school financing system is the Students FIRST Act of 1998, Ariz. Laws 1998, 3d Spec. Sess., ch. 1 ("Students FIRST" or "the Act"). The Governor filed this petition for special action seeking this court's declaration that the Act complies with the Arizona Constitution.

## II. ANALYSIS

### A. Special action jurisdiction

¶ 6 This court has original jurisdiction over the issuance of extraordinary writs[1] against state officers. Ariz. Const. art. VI, § 5(1); *see also State Compensation Fund v. Symington*, 174 Ariz. 188, 191, 848 P.2d 273, 276 (1993). Whether to accept jurisdiction over special action petitions is within the sound discretion of this court. *Symington*, 174 Ariz. at 191, 848 P.2d at 276.

¶ 7 Several factors lead us to accept jurisdiction in this matter. First, the funding of public schools in Arizona is dependent on the outcome of this litigation; accordingly, the case presents important issues of obvious statewide significance. *See Summerfield v. Superior Court*, 144 Ariz. 467, 469, 698 P.2d 712, 714 (1985). Moreover, because the case involves budgeting issues, "[a] prompt resolution is needed so that the legislative and executive branches will know where they stand and can take such action as they determine necessary relative to budgetary matters." *Symington*, 174 Ariz. at 192, 848 P.2d at 277. Finally, a superior court hearing is unnecessary because we can resolve the case on purely legal issues without the aid of fact finding. *Id.* Accordingly, we turn to the substantive issues.

### B. The General and Uniform Clause under *Hull v. Albrecht*

¶ 8 In *Hull v. Albrecht*, we described several components of a school financing system that complies with Article XI, Section 1. We noted that legislatively established standards for adequate capital facilities are a core component of a general and uniform public school financing system.

---

1. The common law writs of certiorari, mandamus, and prohibition are now obtained by "spe-

cial action." *See* Rule 1, Ariz. R.P. Spec. Act., 17B Arizona Revised Statutes ("A.R.S.") (1997).

190 Ariz. at 524, 950 P.2d at 1145. Then, "[o]nce a standard is set, the legislature must choose a funding mechanism that does not cause substantial disparities and that ensures that no school in Arizona falls below the standard." *Id.* Thus, *Hull* establishes a two-pronged test for assessing whether a school financing system meets the state constitutional requirements: (1) the state must establish minimum adequate facility standards and provide funding to ensure that no district falls below them; and (2) the funding mechanism chosen by the state must not itself cause substantial disparities between districts.

¶ 9 Once the state fulfills its responsibilities, "[a] district may then choose to go above, but not below, the statewide standards for capital facilities." *Id.* Accordingly, the constitution does not forbid a financing system that allows districts to seek local sources of revenue, such as property taxation, to surpass the state standards.

### 1. Establishment and ensured funding of adequate facilities

¶ 10 The first prong of the test set forth in *Hull* includes two components: the state must create minimum adequacy standards for capital facilities and must ensure, through state funding, that all districts comply with them. 190 Ariz. at 524, 950 P.2d at 1145. The Act meets this test.

¶ 11 The Act itself creates some building standards. The standards included in the Act regulate the basic physical infrastructure of school buildings, mandate compliance with local codes, and set minimum gross square footage requirements. Students FIRST § 44 (adding Arizona Revised Statutes ("A.R.S.") § 15–2011). The Act also directs the School Facilities Board ("SFB"), a new nine-member administrative agency, to promulgate additional requirements. The SFB must set standards for all facilities and equipment necessary to achieve the state's academic requirements, including school sites, classrooms, libraries, cafeterias, auditoriums or multi-purpose rooms, technology, transportation, and facilities for science, arts and physical education. *Id.* Thus, on its face, the Act complies with the requirement that a general and uniform school financing system include statewide minimum adequacy standards for capital facilities.[2]

¶ 12 The state also must ensure that every school district complies with the minimum adequacy standards. *Hull,* 190 Ariz. at 524, 950 P.2d at 1145. The Act meets this requirement by mandating that every school district must comply with the standards and by providing state monies sufficient to fund each district's compliance. The Act charges the SFB with responsibility for monitoring the adequacy of each school district's facilities. Students FIRST § 44 (adding A.R.S. § 15–2002). If deficiencies exist, the SFB may distribute funds from several new funding sources in order to (1) bring existing facilities up to standards; (2) construct new facilities for growing districts; and (3) maintain all capital facilities at the adequacy level. *Id.* (adding A.R.S. §§ 15–2002, –2021, –2031, & –2041). By providing state funds and empowering the SFB to oversee compliance with the standards, the Act fulfills the state's constitutional obligation to finance adequate capital facilities. *See Hull,* 190 Ariz. at 524, 950 P.2d at 1145. Accordingly, the Act satisfies both components of the first prong of the test set out in *Hull.*

### 2. Financing system and substantial disparities

¶ 13 The second prong of the *Hull* test requires that the legislature fund public schools through a financing system that does not itself cause substantial disparities between districts. 190 Ariz. at 524, 950 P.2d at 1145. By failing to fulfill this requirement, the Act fails to provide for the establishment and maintenance of a general and uniform public school system.

¶ 14 At the outset, we emphasize that nothing in the constitution prohibits a school financing system that allows districts to go

---

2. The parties challenge neither the adequacy of the standards contained in the Act nor the legislative decision to delegate promulgation of the remaining standards to the SFB. The parties agree that whether the rules as promulgated will lead to appropriate and adequate standards cannot yet be determined.

above and beyond state-mandated adequate facilities by individually accessing local financing sources. *See Roosevelt,* 179 Ariz. at 242, 877 P.2d at 815; *Hull,* 190 Ariz. at 524, 950 P.2d at 1145. Indeed, we have noted that "local control" is a historically important value that may contribute to the overall effectiveness of the public school system, *see Roosevelt,* 179 Ariz. at 242, 877 P.2d at 815, and that "the ability to go above and beyond the state system is the key to local control." *Hull,* 190 Ariz. at 523, 950 P.2d at 1144. Financial disparities caused by local control do not run afoul of the state constitution because "[f]actors such as parental influence, family involvement, a free market economy, and housing patterns are beyond the reach of the 'uniformity' required by art. XI, § 1." *Roosevelt,* 179 Ariz. at 242, 877 P.2d at 815. But the general and uniform requirement will not tolerate a state funding mechanism that itself causes disparities between districts.

¶ 15 The Act establishes two local financing options for school districts. Which option is available depends upon whether a district (1) participates in the state funding plan ("participating districts"), or (2) "opts out" of state funding and pays for its capital needs solely through local financing ("opt-out districts"). Students FIRST § 7 (adding A.R.S. § 15–341(A)(31)). Districts may opt out only if they certify their compliance with the state minimum adequacy standards and gain approval of the option from their electors. *Id.* Opt-out districts must report annually to the SFB to ensure that they remain in compliance; districts that fall below the standards will be forced back into the state funding plan. *Id.*

¶ 16 Under the existing school finance system, districts can seek funding based on local property taxation through two methods: capital override elections and general obligation bonding. Override elections allow individual districts, with voter approval, to fund budget increases by raising local property taxes. *See* A.R.S. § 15–481. General obligation bonds, on the other hand, allow a district to leverage its tax base by incurring debt to be repaid through future property taxes. *See* A.R.S. § 15–491; A.R.S. tit. 15, art. 7.

¶ 17 Under the Act, the mechanisms available to school districts for seeking funding through local property taxation vary dramatically between opt-out and participating districts. An opt-out district may use both capital override elections and general obligation bonding. Students FIRST §§ 10 & 35 (amending A.R.S. §§ 15–481 & –1021(B)). Participating districts, unlike opt-out districts, may not issue general obligation bonds. Students FIRST § 35 (amending A.R.S. § 15–1021(A)). Those districts therefore are no longer able to employ the historically most important method of securing local funds for school system financing. Moreover, the assessment ratios applicable to property in participating districts differ from those applicable in opt-out districts.[3] In participating districts, equivalent, or "compressed," assessment ratios apply to all types of property. *Id.* § 67 (adding A.R.S. § 42–15012). Because commercial property within opt-out districts is subject to a higher assessment ratio than is residential property, *see* A.R.S. §§ 42–227 & –162, capital overrides in a participating district will place a proportionally higher tax burden on residential property owners than will overrides of the same amount in an opt-out district. This disparity may significantly weaken participating districts' opportunity to raise funds through overrides.

¶ 18 As part of the option to permit districts to first comply with the Students FIRST requirements and then to provide additional funds through bonding and override elections, the opt-out provision in isolation is not a facial violation of the general

---

3. The "assessment ratio," the full cash value or limited valuation of a parcel of property, and the tax rate imposed determine the tax assessed against a parcel of property. *See* A.R.S. § 42–227. Under the current override system, which will remain intact for opt-out districts, the assessment ratio differs according to the type of property. *For example, current ratios generally assess commercial property at 25% of full cash value and residential property at 10% of full cash value. See* A.R.S. §§ 42–227 & –162. Accordingly, districts with a high proportion of commercial property can generate more revenue, through the same overall tax rate increase, than can districts with a relatively higher proportion of residential property.*

and uniform clause. The Act's option allowing districts to choose local financing in lieu of state funding is not itself unconstitutional. Once the state has assured compliance with state standards, allowing districts to rely on their local property bases to secure local funding to surpass those state standards is not unconstitutional.

¶ 19   But when the restriction on bonding and the compression of school district assessment ratios are considered in conjunction with the opt-out provision, the system as a whole creates significant distinctions in the local funding mechanisms between opt-out and participating districts. Differentially enabling two classes of districts to access their respective property bases results in systemic, structural differences in the ability of districts to exceed state minimums through local funding. Because of these structural differences, the Act as a whole continues to formalize and perpetuate a structure that fails the general and uniform test.

¶ 20   Once the Students FIRST plan assures compliance with adequate standards, differences between districts that result from disparate property wealth or voter willingness to fund capital improvements are not unconstitutional. *Roosevelt*, 179 Ariz. at 242, 877 P.2d at 815; *Hull*, 190 Ariz. at 524, 950 P.2d at 1145. Differences perpetuated by the financing system itself *are* unconstitutional. *Roosevelt*, 179 Ariz. at 242, 877 P.2d at 815; *Hull*, 190 Ariz. at 523, 950 P.2d at 1144. Like the systems we rejected as constitutionally infirm in *Roosevelt* and *Hull*, Students FIRST will necessarily cause substantial disparities between public school districts. Those disparities will result not from factors such as parental influence, family involvement, voter willingness to incur debt for public schools, a free market economy, or housing patterns. Rather, the disparities will result from the funding mechanism chosen by the state. The Arizona Constitution forbids that result.

## C.  Severability of the valid portions of Students FIRST from the invalid portions

¶ 21   Having held that Students FIRST is unconstitutional because the funding mechanism established in the Act causes substantial disparities between opt-out and participating districts, we must next decide whether this defect invalidates the entire Act. We conclude that the provisions relating to bonding, compressed assessment ratios, and the ability of districts to opt out are inseverable from the remainder of the Act, and therefore invalidate Students FIRST in its entirety.

¶ 22   As originally passed, Students FIRST included a severability clause.[4] *See* Students FIRST § 87. However, the legislature subsequently enacted Senate Bill 1120, which repeals the severability clause. Ariz. Laws 1998, 2d Reg. Sess., ch. 164, § 38. Senate Bill 1120 will not become effective until ninety days following the close of the legislative session. *See* Ariz. Const. art. IV, pt. 1, § 1(3).

¶ 23   The state defendants suggest that we should strike any offensive portions of Students FIRST but leave the remainder intact. They argue that course is open to the court because the repeal of the severability clause does not become effective until August 21, 1998. While we agree it would be possible for this court to sever some portions of the Act and uphold the rest under these circumstances, we believe it would be jurisprudentially unwise to invalidate any core provision and leave the remainder in effect.

¶ 24   Determining whether constitutional portions of a statute may be separated and given effect independently of the unconstitutional portions requires that we ascertain whether the legislature intended that the act be severable. *State Compensation Fund v. Symington*, 174 Ariz. 188, 195, 848 P.2d 273, 280 (1993). We will sever a statutory provision only if we can determine that (1) the valid portions are effective and

---

4.  Students FIRST § 87 provides:
    If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or

applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

**40**

enforceable standing alone and (2) the legislature would have enacted the valid portions of the statute absent the invalid provision. *Id.*

¶ 25  In this case, the legislative history, including the legislature's approval of Senate Bill 1120, strongly indicates that the legislature would not have enacted Students FIRST without the provisions establishing the bonding prohibition, compressed assessment ratios, and the opt-out option. Accordingly, in deference to legislative authority and intent, we invalidate the entire Act, thereby enabling the legislature to reconsider the entire financing mechanism in light of the constitutional requirement that a "general and uniform" system cannot allow some districts to employ local funding mechanisms that the state system withholds from other districts.

### III.  CONCLUSION AND RELIEF

¶ 26  Given the foregoing disposition, we believe it is neither advisable nor necessary to address the other substantive and significant constitutional issues raised by the parties.

¶ 27  We therefore declare that Students FIRST violates Article XI, Section 1 of the Arizona Constitution. We extend for sixty days beyond the date of this opinion the time during which the state can distribute funds to the public school system.

ZLAKET, C.J, and JONES, Vice C.J., and FELDMAN, MARTONE and McGREGOR, JJ., concur.