74 P.3d 258

ROOSEVELT ELEMENTARY SCHOOL DISTRICT NO. 66; Crane Elementary School District No. 131; Globe Unified School District No. 1; Cartwright Elementary School District No. 831, Plaintiffs–Appellees,

v.

The STATE of Arizona, Defendant–Appellant.

Somerton Elementary School District; Mary C. O'Brien Elementary School District; Mayer Unified School District; Globe Unified School District No. 1; Dysart Unified School District; Crane Elementary School District No. 131, Plaintiffs–Appellees,

v.

The State of Arizona, Defendant–Appellant.

Nos. 1 CA–CV 02–0475, 1 CA–CV 02–0590, 1 CA–CV 03–0118.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 14, 2003.

Arizona Center for Law in the Public Interest By Timothy M. Hogan, Phoenix, Attorneys for Plaintiffs–Appellees.

Terry Goddard, Arizona Attorney General By Mary O'Grady, Solicitor General, Lynne C. Adams, Assistant Attorney General, and David M. Lujan, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant.

## OPINION

EHRLICH, Judge.

¶ 1 These appeals are the latest stage in an ongoing controversy regarding the Arizona Legislature's funding of the State's public schools. Eight school districts claim that Article 11, Section 1, of the Arizona Constitution[1] has been violated because the Arizona Legislature has failed to fund the Building Renewal Fund, a component of the Students FIRST legislation, according to the statutory formula for fiscal years 1999–2000, 2001–2002 and 2002–2003. Ariz.Rev.Stat. ("A.R.S.") § 15–2031 (Supp.2002). The superior court agreed with the districts. For reasons that follow, we reverse its judgment and remand this case for further proceedings.

## BACKGROUND

¶ 2 In *Roosevelt Elementary School District No. 66 v. Bishop*, 179 Ariz. 233, 240–43, 877 P.2d 806, 813–16 (1994), the Arizona Supreme Court concluded that the State bears responsibility for funding public schools and that the Arizona Constitution was violated by a property-tax-based public-school-financing statutory scheme. It found that the property-based taxation plan had resulted in such significant financial disparities among school districts as to violate Arizona's constitutional guarantee of the maintenance of a general and uniform public school system. *Id.* at 241–43, 877 P.2d at 814–16 ("Funding mechanisms that provide sufficient funds to educate children on substantially equal terms tend to satisfy the general and uniform requirement. School financing systems which themselves

---

1. Article 11, Section 1, Subsection A, provides in pertinent part: "The legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system."

create gross disparities are not general and uniform.").

¶ 3 The Legislature amended the funding plan rejected in *Roosevelt*, but the supreme court held that the statutory amendments failed to adhere to its mandate. *Hull v. Albrecht*, 190 Ariz. 520, 525, 950 P.2d 1141, 1146 (1997)("*Albrecht I*"). The Legislature adopted the Assistance to Build Classrooms ("ABC") Fund, but the court concluded that this legislation also did not satisfy constitutional requirements because it continued to result in substantial capital-facility disparities among school districts, improperly delegated to the districts the State's responsibility to maintain adequate facilities and failed to provide minimum adequacy standards for capital facilities. *Id.* at 523–24, 950 P.2d at 1144–45.

¶ 4 The Legislature then passed the Students FIRST (Fair and Immediate Resources for Students Today) Act of 1998, a school capital-finance program funded by dedicated revenue from the State's transaction privilege tax. *Hull v. Albrecht*, 192 Ariz. 34, 960 P.2d 634 (1998) ("*Albrecht II*"). The supreme court approved Students FIRST to the extent that it created minimum adequacy standards for capital facilities and ensured through state funding that all school districts would be able to comply with those standards. *Id.* at 37 ¶¶ 11–12, 960 P.2d at 637. However, the court disapproved that portion of the scheme allowing a district to "opt out" of state funding and pay for its capital needs solely through local financing because that provision contravened a system of general and uniform public-school financing. *Id.* at 38–39 ¶¶ 18–19, 660 P.2d at 638–39. Because the opt-out section was not severable, the court declared the Students FIRST legislation to be unconstitutional. *Id.* at 39–40 ¶¶ 24–25, 660 P.2d at 639–40.

¶ 5 The Legislature then amended Students FIRST. It established three key funding mechanisms: the New School Facilities Fund, A.R.S. § 15–2041 (Supp.2002), the Deficiencies Correction Fund ("DCF"), A.R.S. § 15–2021 (Supp.2002), and the Building Renewal Fund ("BRF"), A.R.S. § 15–2031 (Supp.2002). Building adequacy standards also were created. A.R.S. § 15–2011 (Supp. 2002).

¶ 6 The New School Facilities Fund was designed, as its name suggests, to provide funds for new facilities as are warranted by growth in student enrollment. A.R.S. § 15–2041(B). The statutory School Facilities Board ("SFB") distributes funding to eligible school districts based on the number of students, projected square footage and the cost per square foot of building a facility meeting minimum adequacy standards. A.R.S. § 15–2041(D).

¶ 7 The DCF is designed to bring existing school buildings to minimum adequate standards by June 30, 2003. A.R.S. § 15–2021(E). School districts may receive such funds to correct quality and square-footage deficiencies. A.R.S. § 15–2021(B). The fund terminates as of July 1, 2004, for projects that were submitted by the districts and approved by the SFB by June 30, 2003. 2002 Ariz. Sess. Laws, ch. 330, § 43.

¶ 8 Whereas the DCF is designed to bring school facilities to minimum adequate standards, the BRF provides funds on a semiannual basis to maintain existing school facilities at minimum adequacy levels consistent with the State's standards. A.R.S. § 15–2031. Funds are appropriated for the BRF based on a "building renewal formula," which accounts for a building's age and size, and the type of renovations that have been performed on the building. A.R.S. § 15–2031(B),(D),(G). The execution of this formula is supported by a database containing information submitted by the school districts and verified by the SFB. A.R.S. § 15–2031(B),(D). The database includes "only those buildings that are owned by school districts that are required to meet academic standards." A.R.S. § 15–2031(D). BRF money must first be used for any buildings in the database, but, if those facilities have been made adequate, the districts may use BRF money for "any other buildings owned by the school district," albeit only for certain defined purposes: "[m]ajor renovations and repairs of a building," "[u]pgrading systems and areas that will maintain or extend the useful life of the building," "[i]nfrastructure costs" and the "[r]elocation and placement of portable and modular buildings." A.R.S. § 15–2031(B).

¶ 9 For the 1998–1999 fiscal year, the first year of application, the Legislature appropriated $75 million to the BRF. For succeeding years, the Legislature had established a schedule according to which the school districts would submit certain data to the SFB by September 1. A.R.S. § 15–2031(D). The SFB then would apply the formula to the data, report the distribution amount to the Legislature's Joint Committee on Capital Review on December 1 and advise the state treasurer on January 1 as to the amount of money to be transferred from the State's general fund to the BRF for distribution to school districts in two equal payments in November and May of the following year. A.R.S. § 15–2002(A)(10) (2002). Thus the funding is fixed based on September 1 data, although the database is continuously revised.

¶ 10 Although the SFB began to collect the data as directed, for 1999–2000, the SFB, rather than applying the statutory formula, simply increased by ten percent the $75 million appropriation for the first year and instructed the state treasurer to credit $82.5 million to the BRF. Application of the data to the formula would have required $109.1 million to be transferred.

¶ 11 Four school districts—Roosevelt Elementary School District No. 66, Crane Elementary School District No. 131, Globe Unified School District No. 1 and Cartwright Elementary School District No. 831—sued "to enforce [the State's] funding obligations established by the Students FIRST legislation."[2] On the premise that the "only regular and annual sources of capital funding for school districts under Students FIRST are the [BRF] and soft capital" money,[3] the districts alleged that the State had failed to perform its "mandatory, nondiscretionary duty" to fully fund Students FIRST, particu-

larly the BRF. They therefore asked that the superior court both order the Legislature to "appropriate the funds necessary to fully fund" the BRF for 1998–1999, 1999–2000 and future years and order the SFB to instruct the state treasurer in future years to credit the BRF "in the amount necessary to fully fund" the BRF according to the statutory formula.[4]

¶ 12 The superior court, ruling on cross-motions for summary judgment, found no violation in the funds allocated for 1998–1999. It ruled that "the appropriation of a specific sum by the legislature for fiscal year 1998 demonstrates that there was no expectation that the formula for the [BRF] was intended to be used by the school facilities board for the first fiscal year."

¶ 13 The superior court found that the failure to use the formula for the following year had violated the Students FIRST law but ruled:

> The Court cannot conclude by the mere fact that the formula yielded a substantially higher number than the estimate used that there is a constitutional violation because of the failure to fully fund the building renewal formula for one year. No evidence has been presented to the Court concerning what impact, if any, the shortage caused. The Court cannot conclude that the $25 million deficiency in the [BRF] in 1999 means that there is not a general and uniform school financing system that includes minimum adequacy standards for capital facilities and that State monies are not sufficient to fund each district's compliance. Before this Court could find that the one year deficiency has resulted in a constitutional violation, evidence would have to be presented about the impact of the failure to comply with the building renewal formula on the constitu-

---

**2.** The districts sued the State, the Governor, the School Facilities Board, the President of the Arizona Senate and the Speaker of the Arizona House of Representatives. Upon the defendants' motion, all of the defendants but the State were dismissed.

**3.** "Soft capital allocation monies shall only be used for short-term capital items that are required to meet academic adequacy standards such as technology, textbooks, library resources,

instructional aids, pupil transportation vehicles, furniture and equipment." A.R.S. § 15–962(D)(2002).

**4.** When this complaint was amended, the districts no longer asked for the alternative relief that the court declare the school-finance system unconstitutional because, as funded, it violated Article 11, Section 1, of the Arizona Constitution.

tional test set forth by the Supreme Court in *Albrecht I* and *Albrecht II* [citations omitted].

¶ 14 Funding for 2000–2001 was as prescribed by the statutory formula.

¶ 15 For 2001–2002, the SFB again used the statutory formula to calculate the distribution to the BRF. It dispensed $61,393,206 in November 2001 and planned to do the same in May 2002. However, in December 2001, the Legislature transferred $34.9 million from the BRF to the State's general fund. H.B.2016, 2001 Ariz. Sess. Laws (2d Spec.Sess.). Then, in March 2002, the Legislature increased the amount of money transferred from the BRF to the general fund to approximately $70 million. H.B.2003, 2002 Ariz. Sess. Laws (3d Spec.Sess.). Consequently, only $672,093 was distributed by the SFB in May 2002.[5]

¶ 16 The parties filed cross-motions for summary judgment based upon the sufficiency of the BRF for 1998–1999, 1999–2000 and 2001–2002. The superior court declined to reconsider the earlier order.

¶ 17 With regard to 1999–2000, the State argued that the school districts had not connected any deficiency in funding to an inability of students to meet the mandated academic standards and, therefore, that the districts had not demonstrated that the monetary lack constituted a violation of the Arizona Constitution. The State added that the BRF was not intended to cover administrative offices, although it conceded that, pursuant to A.R.S. § 15–2031(B), should it not be necessary to use the BRF for school buildings in the database, the money could be used for "other buildings" that could include administrative offices and storage facilities.

¶ 18 The superior court concluded that the school districts had "produced uncontroverted evidence that the State's failure to follow the formula in funding the BRF in 1999–2000 had an impact on [the districts'] ability to

meet academic standards and therefore was unconstitutional." It granted the districts "partial summary judgment as to the constitutionality issue," but it also found that disputed facts existed, including some involving whether certain of the districts' projects would be covered by the BRF.

¶ 19 Finally, the superior court found of the reduction in funding in 2001–2002 "that such a major devastation of the BRF is unconstitutional in and of itself, and requires no proof of its impact on the affected students' ability to meet required academic standards." The court later awarded attorneys' fees to the school districts.

¶ 20 Meanwhile, the SFB had utilized the statutory formula for 2002–2003 to instruct the state treasurer to transfer approximately $128 million to the BRF. However, in May 2002, shortly after the entry of the summary judgment, the Legislature directed the treasurer to disregard those instructions from the SFB regarding transfers from the State's general fund to the BRF for 2002–2003 and instead ordered her to transfer only $38.3 million. H.B. 2710, 2002 Ariz. Sess. Laws (2d Reg.Sess.). The Legislature also suspended the use of the BRF formula for 2002–2003 and 2003–2004, stating that the money "necessary for school facilities required to meet academic standards will be provided from the [DCF]." 2002 Ariz. Sess. Laws (2d Reg.Sess.), ch. 330, § 61(B). Further, the Legislature expressed its intent "that the facilities and equipment necessary and appropriate to enable students to achieve academic standards ... are exclusively the facilities and equipment addressed by the" SFB in the Building Adequacy Guidelines it had adopted on November 18, 1999, Ariz. Admin. Code ("A.A.C.") R–7–6–201. 2002 Ariz. Sess. Laws (2d Reg.Sess.), ch. 330, § 61(C).

¶ 21 Six school districts—Somerton Elementary School District, Mary C. O'Brien Elementary School District, Mayer Unified School District and Dysart Unified School

---

5. In September 2000, using the statutory formula, the money for the BRF was calculated as $122,786,410. However, because it was originally thought by the SFB that it was required to update the calculations as the database was updated, the SFB advised the state treasurer to

transfer $132 million to the BRF for the next fiscal year. The amount of $61,393,206 was distributed to the school districts in November 2001, leaving $61,393,206 to be distributed to the districts in May 2002 plus $8,606,794 that the SFB mistakenly asked be transferred to the BRF.

District plus two districts also in the first case, Globe Unified School District No. 1 and Crane Elementary School District No. 131—then challenged the latest funding reductions. Again starting with the premise that the BRF is "the only source of funding available under Students First for the long-term capital needs" of the districts, it sought a declaration that "the school finance system is unconstitutional" for two reasons: one, because it violates Article 11, Section 1, of the Arizona Constitution and, two, because the Legislature's direction to the state treasurer to disregard the SFB's instruction and transfer to the BRF approximately $90 million less than the amount dictated by the formula violates both Students FIRST and the Arizona Constitution.

¶ 22 After a trial to the superior court, the court ruled that the school districts had produced sufficient evidence to support their contention that the Legislature's failure to fully fund the BRF had resulted in the districts' inability "to provide the equipment and facilities necessary to enable their students to meet the State's academic standards." It dismissed the State's contention that, because the statutory funding formula had only been suspended, there was no violation of either the Arizona constitution or the Students FIRST legislation as "a distinction without a difference ... that still results in unconstitutional under-funding condemned by *Roosevelt*, *Albrecht I* and *Albrecht II*," adding that, "[i]f this were not so, the State could simply violate its obligations under Students FIRST by suspending the funding every year to the detriment of Arizona's public school students." It thereupon ordered the Legislature "to restore the $90,000,000 by which it reduced the [BRF] for the 2002–2003 school year" by June 30, 2003.[6]

¶ 23 The cases had been consolidated by the superior court. The State appealed in each case, and the appeals were consolidated by this court.

## DISCUSSION

¶ 24 We analyze *de novo* those issues of law involving constitutional and statu-tory interpretation. *Hobson v. Mid–Century Ins. Co.*, 199 Ariz. 525, 528 ¶ 6, 19 P.3d 1241, 1244 (App.2001)(review *de novo* issues of statutory interpretation and constitutionality); *Ariz. Dep't of Pub. Safety v. Superior Ct. (Falcone)*, 190 Ariz. 490, 494, 949 P.2d 983, 987 (App.1997)(review *de novo* statute's constitutionality, presuming law to be constitutional and giving challenger burden of establishing otherwise). We also review *de novo* whether there are any genuine issues of material fact and whether the superior court erred in its application of the law. *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Govs.*, 184 Ariz. 419, 424, 909 P.2d 486, 491 (App.1995).

¶ 25 The school districts acknowledge that, as enacted, Students FIRST facially is a constitutional public-school financing system. *See Albrecht II*, 192 Ariz. at 36–37, 960 P.2d at 636–37. Their overarching concern is that the lack of full funding as authorized by the statutory formula for the BRF for fiscal or school years 1999–2000, 2001–2002 and 2002–2003 does not satisfy the Arizona Constitution, and the superior court largely agreed with them. Of the issues the State then raised on appeal, the resolution of the following issues is dispositive:

1. whether the court erred in determining that the districts adequately demonstrated that the reduced funding for the BRF for 1999–2000 affected their students' ability to meet academic standards;

2. whether the court erred in concluding that the districts did not have to demonstrate that the reduction in BRF funding for 2001–2002 affected their ability to meet academic standards; and

3. whether the court erred in ordering the BRF to be fully funded according to the statutory formula for 2002–2003 because the districts presented no evidence of current deficiencies in those facilities necessary to meet academic standards.

¶ 26 To satisfy the requirements of Article 11, Section 1, the State's "constitutional obligation [is] to fund a public school system that is adequate." *Albrecht I*, 190

6. The superior court order was stayed by this court. The resolution of this case is such that a stay no longer is required upon the filing of this opinion.

Ariz. at 524, 950 P.2d at 1145; *see Albrecht II*, 192 Ariz. at 37 ¶ 8, 960 P.2d at 637.

> But, in addition to providing a minimum quality and quantity standard for buildings, a constitutionally adequate system will make available to all districts financing sufficient to provide facilities and equipment necessary and appropriate to enable students to master the educational goals set by the legislature or by the State Board of Education pursuant to the power delegated by the legislature.

*Albrecht I*, 190 Ariz. at 524, 950 P.2d at 1145.

¶ 27 The Students FIRST legislation reflected the supreme court's mandate that school districts be funded so as to provide the facilities necessary for students' academic achievement. *See Albrecht II*, 192 Ariz. at 36–37 ¶ 8, 960 P.2d at 636–37. To then execute its directive, the legislature established the SFB and required it to promulgate guidelines regarding "the minimum quality and quantity of school buildings and facilities and equipment necessary and appropriate to enable pupils to achieve [designated] academic standards," A.R.S. § 15–2011(F),[7] addressing school sites, classrooms, libraries and media centers, cafeterias, auditoriums and multi-use space, technology, transportation, facilities for science, arts and physical education, and "[o]ther facilities and equipment that are necessary and appropriate to achieve the academic standards prescribed." A.R.S. § 15–2011(F)(1)–(9). The SFB established the guidelines, omitting such facilities as school-district administrative offices, warehouses, transportation facilities and special-program space, A.A.C. R–7–6–201, reflecting the Legislature's insistence that priority in funding be given to the dis-

trict facilities directly necessary for scholastic success. *See* A.R.S. § 15–2031.

¶ 28 While the school districts complain about the lack of funding of the BRF to the extent of the statutory formula, they have not complained that BRF expenditures are directed in the first instance to those facilities "necessary and appropriate to enable pupils to achieve [designated] academic standards," in legislative words echoing those of the supreme court in *Albrecht I*, nor have they challenged the SFB guidelines developed in execution of that legislative imperative. There is, rather, a narrow focus to the districts' complaints that the lack of funding of the BRF according to the statutory formula resulted in the districts' inability to meet the academic standards expected of their pupils by the Legislature.

### A. 1999–2000 Fiscal Year Funding

¶ 29 For 1999–2000, rather than employ the statutory formula for funding the BRF, the Legislature simply increased the $75 million appropriation of the previous year by ten percent, and the SFB therefore instructed the state treasurer to credit $82.5 million to the BRF. Had the BRF formula been applied, $109.1 million would have been transferred from the general fund to the BRF. The superior court found that this failure to follow the formula had such an adverse impact on the school districts' ability to meet the academic standards required of them that it was unconstitutional.

¶ 30 The school districts argue that, because the DCF addresses only certain needs, they are forced to rely on BRF funds to meet other needs.[8] While the State generally does

---

7. These standards are set forth in A.R.S. §§ 15–203(A)(12) and (13)(2002), 15–701 (2002) and 15–701.01 (2002).

8. The district office of the Williams Unified School District has an electrical system requiring that the lights be turned off before the photocopy machine can be operated or the electrical breakers will trip, an infestation of skunks, mice and squirrels, and storage space so lacking that records are maintained in the restrooms. The Tolleson Elementary School District office is too small to house all of its personnel so there is an outbuilding with a leaking roof for the special-education staff. This district also lacks a computer

system for a student database with the consequence that test scores must be sorted and analyzed by hand, making it impossible to develop extra indicators of student needs. Also, there is neither a supply warehouse nor a facility to house and maintain buses, making the elementary school district dependent on the Tolleson High School for transportation services and effectively barring many pupils from after-school programs. Similarly, the Miami Unified School District's warehouse and maintenance facilities leak, and there are additional lighting and security problems.

not dispute the districts' contentions regarding the conditions of certain facilities, it responds that the capital needs presented by the districts "are, at best, only tangentially related to student opportunity and achievement. [The districts] have not connected, and cannot connect, any alleged funding deficiencies with the inability of students to achieve the State's prescribed academic standards."

¶ 31 We too accept the school districts' evidence of their capital needs. Nonetheless, they first are limited in their ability to use BRF money because they must use those funds primarily for any buildings in the database and only after those needs are met for any other district buildings. A.R.S. § 15–2031(B). Additionally, many of the needs expressed by the districts would not likely be remedied by BRF money because that money may not be used for new construction. A.R.S. § 15–2031(C)(1). Also, expenditures for routine maintenance are limited to eight percent of BRF money. A.R.S. § 15–2031(C)(6),(J).

¶ 32 We also agree with the State that the school districts have not met their burden to prove that the Legislature's failure to fund the BRF according to the formula for 1999–2000 constituted a constitutional violation. The facilities about which the districts complain are either new construction excluded from the BRF or primarily administrative and excluded from the BRF database and the SFB guidelines because the SFB has determined that such facilities are not required to meet the State's academic standards for its students.[9] In other words, although the districts showed that they have capital facilities needing repairs and renovation, they did not link those needs to their pupils' scholastic performance. What they showed instead is that district officials have a significantly more difficult situation than they would have if there were sufficient funds available to improve their facilities not directly linked to pedagogical success.

■ ¶ 33 Within the limits of the Constitution, it is not appropriate that a court involves itself in the legislative process such as to question the wisdom or priorities of the Legislature's determination that money it appropriates first be apportioned to what the Legislature perceives as the primary need to bring buildings necessary for academic success to minimum adequate standards before restoring buildings dedicated to other school uses. See A.R.S. § 15–2031, § 15–2011(F).

> The inconvenience or impolicy of a law are not arguments to a judicial tribunal, if the words of the law are plain and express.
>
> Such arguments must be reserved for legislative consideration.... [The courts] are bound to decide an act to be unconstitutional, if the case is clear of doubt; but not on the ground of inconvenience, inexpediency, or impolicy. It must be a case in which the act and the constitution are in plain conflict with each other. If the question be doubtful, the court will presume that the legislature has not exceeded its powers.

*United States v. Fisher,* 6 U.S.(2 Cranch) 358, 383–84, 2 L.Ed. 304 (1805). *See also Hunt v. Norton,* 68 Ariz. 1, 11, 198 P.2d 124, 130 (1948)(If a "statute is oppressive or unworkable, relief lies with the legislative department."); *Commonwealth ex rel. Elkin v. Moir,* 199 Pa. 534, 49 A. 351, 352 (1901)("The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people."). "Generally, every legislative act is presumed to be constitutional and every intendment must be indulged in by the courts in favor of validity of such an act." *Giss v. Jordan,* 82 Ariz. 152, 159, 309 P.2d 779, 783 (1957). This is most particularly true given that the school districts' underlying challenges are to the lack of full legislative funding only for those facilities addressed by the BRF and not to the restrictions of the BRF itself or the SFB guidelines as inadequate to meet their students' needs, academic and not, directly or not. It is not enough to allege that the BRF funding is inadequate for the districts' purposes when the districts' complaints are to

9. A.A.C. R–7–6–758 pertains to administrative space in school buildings. *See also* A.A.C. R–7– 6–101.

those facilities not covered by the BRF and the limitations of the BRF and the SFB guidelines are not challenged.

### B. 2001–2002 Fiscal Year Funding

¶ 34 For 2001–2002, the SFB used the statutory formula to calculate the distributions to the BRF and distributed $61,393,206 in November 2001 and planned to distribute the same amount in May 2002, but the Legislature transferred approximately $70 million from the BRF to the State's general fund. H.B.2003, 2002 Ariz. Sess. Laws (3d Spec.Sess.). As a result, only $672,093 was distributed by the SFB in May 2002. The superior court ruled that "such a major devastation of the BRF is unconstitutional in and of itself, and requires no proof of its impact on the affected students' ability to meet required academic standards."

¶ 35 The superior court erred in declaring that a lack of funding constitutes a constitutional violation per se. Rather, it is incumbent upon the school districts to prove that the reduction had an impact on their students' academic education, i.e., that the Legislature's redirection left the districts with insufficient financial resources to provide facilities "necessary and appropriate to enable students to master the educational goals set by the legislature." *Albrecht I*, 190 Ariz. at 524, 950 P.2d at 1145. Although we, as did the superior court, may speculate that such funding cuts in all likelihood had a significant impact on the districts' students, it is not appropriate that we make an assumption rather than act on evidence.

### C. 2002–2003 Fiscal Year Funding

¶ 36 In May 2002, the Legislature directed the state treasurer to disregard instructions from the SFB to transfer approximately $128 million from the State's general fund to the BRF for 2002–2003 and instead required the treasurer to transfer only $38.3 million. H.B. 2710, 2002 Ariz. Sess. Laws (2d Reg. Sess.). The Legislature also suspended the use of the BRF formula for 2002–2003 and 2003–2004, stating that the money "necessary for school facilities required to meet academic standards will be provided from" the DCF.2002 Ariz. Sess. Laws (2d Reg.Sess.),

ch. 330, § 61(B). The Legislature added "that the facilities and equipment necessary and appropriate to enable students to achieve academic standards ... are exclusively the facilities and equipment addressed by the school facilities board in the minimum school facility adequacy guidelines." 2002 Ariz. Sess. Laws (2d Reg.Sess.), ch. 330, § 61(C).

¶ 37 The superior court found: "The evidence produced by [the parties] clearly establishes that the $90,000,000.00 cut in a 2002–2003 Building Renewal Fund does not meet the requirements of Article 11 of the Arizona Constitution and the Supreme Court's opinion in *Albrecht I* and *Albrecht II* because the Legislature has failed to fund the Building Renewal Fund fully as the Arizona Supreme Court requires."

¶ 38 Again, the superior court erred in ruling that a lack of funding constitutes a constitutional violation per se. We also disagree with the court's characterization of the supreme court's decisions in *Albrecht I* and *Albrecht II*. Rather than order the Legislature to initiate and supply a fund like the BRF, the court in *Albrecht I* stated that "a constitutionally adequate system will make available to all districts financing sufficient to provide facilities and equipment necessary and appropriate to enable students to master the educational goals set by the legislature." 190 Ariz. at 524, 950 P.2d at 1145. Further, the court wrote, "[o]nce a standard is set, the legislature must choose a funding mechanism that does not cause substantial disparities and that ensures that no school in Arizona falls below the standard." *Id.*

¶ 39 In *Albrecht II*, the supreme court approved "the funding mechanism" of Students FIRST as compliant with Article 11, section 1. 192 Ariz. at 37 ¶¶ 11–12, 960 P.2d at 637. It only found unconstitutional the provision permitting an "opt out" from that financing process, *id.* at 38–39 ¶¶ 18–19, 960 P.2d at 638–39, and, unable to sever the opt-out proviso from the remainder of the statutory plan, declared the entirety of the legislation unconstitutional. *Id.* at 39–40 ¶¶ 24–25, 960 P.2d at 639–40.

¶ 40 In neither *Albrecht I* nor *Albrecht II* did the supreme court remove the burden on the school districts to demonstrate that their

students are unable to meet the educational goals of the Legislature due to the Legislature's failure to fund the BRF according to the legislative formula. The limits set by Article 11, Section 1 having been demarcated by the supreme court in its approval of all but the opt-out provision of the Students FIRST legislation, we may not and should not substitute our judgment for that of the Legislature, *see State v. A.J. Bayless Markets, Inc.*, 86 Ariz. 193, 197, 342 P.2d 1088, 1090 (1959)(discussing court deference to legislative objective to protect safety, health, morals and general welfare of its citizens as long as legislation has reasonable relationship to the object sought to be achieved), and the Legislature has linked funding for facilities to the achievement of its academic standards as a higher priority than funding for other buildings.

¶ 41 To no surprise, the evidence demonstrated that the school districts are grappling with the Legislature's funding cuts and struggling to meet their immediate needs, but the evidence was not unequivocal about the loss of the BRF money in terms of student academic achievement. Yuma School District No. 1 has approximately $187,000 of BRF funds remaining, having spent a majority of its BRF funds on a computer-network infra-structure, lighting, air-conditioning and electrical work for which it did not want to wait for other funds, including DCF money, and it will be able to maintain its schools and facilities at minimum adequacy levels if the BRF is not funded according to the formula for three years. Tolleson expects to complete certain repairs and have a balance of approximately $70,000 that it will place in a contingency fund.[10] Globe Unified School District No. 1 has received approximately $1.6 million of BRF money and has a balance of approximately $700,000, from which it plans to spend $460,000 for other expenses, including those for compliance with the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (2002). While Globe has remaining capital needs, it will be able to maintain its facilities at an adequate level for two to five years because most of those needs are "anticipated needs" for aging buildings, including tile and carpet replacement, roof leaks and kitchen renovation.

¶ 42 To the contrary, the interim executive director of the SFB, Ed Boot, testified that, if the BRF were not fully funded, "the guidelines will not be able to be adhered to by the school districts." He added that deficiencies occur every year and that the school districts need BRF money to address those deficiencies, but this evidence is insufficient to demonstrate a constitutional violation.

¶ 43 The school districts argue the importance of administrative facilities to student achievement. This is essentially an indirect challenge to the Legislature's determination that these types of facilities are not as necessary as other types of facilities in order for students to achieve the academic standards set by the Legislature. 2002 Ariz. Sess. Laws (2d Reg.Sess.), Ch. 330, § 61(C).

¶ 44 We are not disputing the importance of administrative facilities. Evidence showed that district administrative offices support the instructional programs in the schools and are important for effective instruction and concomitant student achievement. However, without a challenge to the legislative and SFB determinations to exclude such facilities as a priority, we decline to review the exclusion of administrative facilities.

¶ 45 Again, the school districts claim that the definition of and timing to correct facility "deficiencies" is faulty,[11] causing them to use

---

10. Tolleson received funds from a $3 million bond approved by taxpayers to construct transportation and warehouse facilities. BRF money may not be used for new construction. A.R.S. § 15–2031(C)(1).

11. The Legislature created an Emergency Deficiencies Correction Fund. A.R.S. § 15–2022 (2002). To obtain an emergency grant of funding, a school district must apply to the SFB and show "a serious need for materials, services or construction or expenses in excess of the district's adopted budget for the current fiscal year and that seriously threaten the functioning of the school district, the preservation or protection of property or public health, welfare or safety." A.R.S. § 15–2022(C),(E). The emergency fund is funded by DCF money and the New School Facilities Fund, and the SFB will not authorize any transfer from these sources if the transfer "will affect, interfere with, disrupt or reduce" any

BRF monies for projects that should have been covered by the DCF.[12] However, the districts have not challenged the DCF, its demise or its final administration.

¶ 46 As the school districts posit, we understand that the Legislature's decision to repeatedly not fully fund the BRF to meet the capital needs of the public schools well may result in large future expenditures, expenditures very possibly greater than what the formula requires, to allow students to achieve academic success. This is a matter of legislative discretion, however.

¶ 47 Finally, because we reverse and remand, we vacate the award of attorneys' fees to the school districts.

### CONCLUSION

¶ 48 There is no doubt that the public schools in Arizona need adequate funding in order for students to achieve the academic standards declared by the Legislature. However, because the school districts have not shown that they have current unmet needs related to academic achievement, we reverse and remand this case for further proceedings consistent with this opinion.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge and G. MURRAY SNOW, Judge.

---

previously approved capital projects. A.R.S. § 15–2022(A).

12. Yuma used BRF money for "new windows, new lighting, new electrical service and new heating, ventilation, air-conditioning system." While many if not all of these projects "would have qualified as deficiency corrections," the district decided that the air-conditioning could not wait for the DCF process. Yuma also decided to spend approximately $400,000 to install a computer network although the SFB has funded similar projects through the DCF.